FENNEMORE CRAIG, P.C.
Amy Abdo (No. 016346)
Carrie Pixler Ryerson (No. 028072)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
Email: aabdo@fclaw.com
Email: cryerson@fclaw.com

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
Robert W. Turken (*pro hac vice* application to be submitted)
Scott N. Wagner (*pro hac vice* application to be submitted)
Lori P. Lustrin  (*pro hac vice* application to be submitted)
Shalia M. Sakona (*pro hac vice* application to be submitted)
1450 Brickell Avenue
Suite 2300
Miami, FL 33131-3456
Telephone: (305) 374-7580
Email: rturken@bilzin.com
Email: swagner@bilzin.com
Email: llustrin@bilzin.com
Email: ssakona@bilzin.com

*Attorneys for Plaintiff Avnet, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Avnet, Inc., | COMPLAINT |
| Plaintiff, | |
| vs. | |
| Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO Co., Ltd.; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc. (D/B/A Holystone International); Okaya Electric Industries Co., Ltd.; Okaya Electric America Inc.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., | **JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei
Corporation of America, Inc.; Nitsuko
Electronics Corporation; Nissei Electric Co.,
Ltd.; Shizuki Electric Co., Ltd.; Soshin
Electric Co., Ltd.;  and,
Soshin Electronics of America, Inc.,

                    Defendants.

Plaintiff, Avnet, Inc., brings this action for damages under the antitrust laws of the United States against defendants Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO., Ltd.; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc. (D/B/A HolyStone International); Okaya Electric Industries Co., Ltd.; Okaya Electric America Inc.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America, Inc.; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; Shizuki Electric Co., Ltd.; Soshin Electric Co., Ltd.; and Soshin Electronics of America, Inc. (collectively, the "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    Defendants and their co-conspirators (together, "Conspirators") formed an international cartel that conducted a long-running conspiracy (the "Conspiracy") that extended from at least September 1, 1997 through March 31, 2014 (the "Conspiracy Period").  The purpose and effect of this conspiracy was to fix, stabilize, and maintain prices for aluminum, tantalum, and film capacitors (together, "Affected Capacitors").

2.    Capacitors are integral components found in virtually all electronic devices—from simple household appliances, to computers, automobiles and sophisticated industrial, telecommunication, medical, and aerospace technology products.  Capacitors store electrical energy and help regulate the flow of the electrical current as it moves through a circuit.

3.    Because the functions of capacitors are fundamental to the operation of practically all electronic devices, capacitors are sold in large volume and demand is immense.  In 2003, global revenues for all manufacturers in the capacitor industry totaled approximately $16 billion based on the sales of trillions of capacitors.  Industry analysts estimate that global revenues from the sale of capacitors will reach over $20 billion by 2016.

4.     In spite of their critical functions, the vast majority of capacitors are very small—sometimes the size of a pencil point—and typically cost no more than a few cents, and often as little as a fraction of a cent.  Capacitors of like capacitance, dielectric, and form factor also are generally interchangeable despite different manufacturers.  As a result, the price of these products is the primary differentiation for purchasers.

5.     The commoditized nature of capacitors in conjunction with the mature nature of the industry, significantly high barriers to entry, and necessary economies of scale, rendered the capacitors market especially susceptible to anticompetitive manipulation.  This allowed and enabled the efforts by Conspirators to raise, maintain, or stabilize prices, or to reduce the supply of Affected Capacitors, which artificially inflated prices above those that would prevail in a competitive market.

6.     In the advent of the Conspiracy Period, Conspirators had begun to experience reduced profit margins as a result of increased competition among manufacturers of Affected Capacitors and the rise in popularity of considerably cheaper ceramic capacitors.  To bolster the profitability of their respective Affected Capacitors sales, and to negate the impact of declining demand on price, Conspirators—commencing as early as September 1997 and continuing throughout the Conspiracy Period— combined, conspired, and agreed to curtail competition of Affected Capacitors among themselves by fixing prices, allocating customers through bid-rigging, and constraining their manufacturing output.

7.     These anti-competitive agreements and understandings were reached during regular and ad hoc group and bilateral meetings and communications during which Conspirators discussed and coordinated strategy for achieving their desired anti-competitive ends.  Conspirators agreed at these meetings and through these communications to uniformly price their competing Affected Capacitors in order to increase profitability.  They also discussed how to justify and convey their collusive manufacturing, delivery, and pricing changes to customers and the market.

/////

8.    Both in the course of these live meetings, as well as through written and oral communications, Conspirators exchanged confidential and commercially sensitive information regarding Affected Capacitors, including customer and industry-specific price requests, current and future prices, anticipated timing of pricing changes, sales volume, production capacity, production lead times, profitability, and availability and cost of raw materials.  Conspirators used this data to determine concerted prices, allocate customers, and otherwise facilitate the Conspiracy.

9.    Conspirators adhered to these collusive agreements and understandings as they issued bids and price announcements and "negotiated" prices with their customers—selling Affected Capacitors at inflated non-competitive prices throughout the Conspiracy period.

10.    Competitors for common customers coordinated their respective bids to secure mutual market shares consistent with their production capacities, agreeing in advance which seller should win the bid and what their respective initial and final offers should be to guarantee that outcome.  Conspirators urged one another "not to give in" to customers' requests for price reductions, and to avoid being drawn in to "price wars."

11.    Through their collusive, anticompetitive actions, Conspirators effectively negated, and reversed the normal economic benefits of increased competition, and thus cost their customers, including Plaintiff, hundreds of millions of dollars in overcharges.

12.    Meanwhile, Defendants took pains to conceal their anticompetitive and unlawful conduct from their customers, regulators, and the public. The Conspiracy remained an international secret until the spring of 2014, when law enforcement and competition authorities around the globe first publicly acknowledged their respective investigations into anticompetitive conduct in the capacitors industry.  By that time, customers like Plaintiff had been paying artificially inflated prices for Affected Capacitors for approximately 17 years.

/////

3

13.     In 2014, Conspirator Panasonic Corporation, on behalf of itself and certain of its wholly-owned subsidiaries admitted to the U.S. Department of Justice ("DOJ") that Conspirators engaged in a conspiracy to fix the prices of Affected Capacitors beginning no later than January 1, 2003 and that Conspirators' cartel activities were undertaken for the purpose of artificially maintaining and inflating prices of aluminum, tantalum, and film capacitors sold to United States purchasers and purchasers worldwide.

14.     In January 2016, Conspirator NEC TOKIN Corporation pleaded guilty to violating Section 1 of the Sherman Act by entering into and engaging in a combination and conspiracy "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere." The Information to which NEC TOKIN pleaded guilty dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."

15.     In April 2016, the DOJ announced that Hitachi Chemical Co. Ltd. agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information against Hitachi Chemical charged Hitachi Chemical with conspiring with its competitors between 2002 and 2010. On June 9, 2016, Hitachi Chemical pled guilty to conspiring with its competitors to fix the prices of electrolytic capacitors as charged in the Information.

16.     During the Conspiracy Period, Plaintiff purchased Affected Capacitors in the United States directly from certain Conspirators, and, as a result of the Conspiracy, paid higher prices than would have prevailed in a competitive market. Plaintiff thus has suffered damages as a consequence of the Conspiracy, and brings this action to recover the overcharges it paid for the Affected Capacitors it purchased during the Conspiracy Period.

/////

/////

4

## II.     JURISDICTION AND VENUE

17.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' price-fixing and bid-rigging in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

18.     This Court has subject matter jurisdiction over this action pursuant to Section 4 of the Clayton Act (15 U.S.C. §§ 15(a)) and 28 U.S.C. §§ 1331 and 1337.

19.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Conspiracy Period, the Conspiracy directly and substantially affected the price of Affected Capacitors purchased in the United States.

20.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22).  In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States as they manufactured Affected Capacitors for sale in the United States, and their conspiratorial conduct had a substantial effect on interstate and foreign trade and commerce.

21.     Venue is proper in the District of Arizona under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claim occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.

## III.    PARTIES

### A.     Plaintiff

22.     Plaintiff, Avnet, Inc., is a New York corporation with its principal place of business in Phoenix, Arizona.  Avnet is a major U.S. distributor of electronic

components, including capacitors.  Avnet directly purchased Affected Capacitors from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

B. **Defendants**

i. **Hitachi**

23. Defendant Hitachi Chemical Co., Ltd. ("Hitachi Chemical"), is a Japanese corporation with its principal place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo 100-6606, Japan.  During the Conspiracy Period, Hitachi Chemical manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

24. Defendant Hitachi AIC Inc. ("Hitachi AIC"), a Japanese corporation, is a wholly-owned subsidiary of Hitachi Chemical with its principal place of business located at 1065, Kugeta, Moka-Shi Tochigi 321-4521, Japan. During the Conspiracy Period, Hitachi AIC—either directly or through its divisions, business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers aluminum, tantalum, and film capacitors manufactured by its own business units, subsidiaries, agents, or affiliates or those of its corporate parent, Hitachi Chemical.

25. In or about December 2009, Hitachi AIC sold its tantalum and niobium capacitors division to Defendant Holy Stone Enterprise Co., Ltd.  The acquisition was completed on or about April 1, 2010, and the tantalum and niobium capacitors division was renamed Holy Stone Polytech Co., Ltd. ("Holy Stone Polytech"), a Japanese corporation and wholly-owned subsidiary of Holy Stone Enterprise Co., Ltd.

26. Defendant Hitachi Chemical Co. America, Ltd. ("Hitachi Chemical America"), a New York corporation, is a wholly-owned subsidiary of Hitachi Chemical with its principal place of business located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014.  During the Conspiracy Period, Hitachi Chemical America—either directly or through its business units, subsidiaries, agents, or affiliates—

6

sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Hitachi Chemical (including, without limitation, Hitachi AIC).

27.   Defendants Hitachi Chemical, Hitachi AIC, and Hitachi Chemical America are together referred to herein as "Hitachi."

### ii.   ELNA

28.   Defendant ELNA Co., Ltd. ("ELNA Co."), is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture 222-0033, Japan.   During the Conspiracy Period, ELNA Co. manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates, to United States purchasers.

29.   Defendant ELNA America Inc., ("ELNA America") a California corporation, is a wholly-owned subsidiary of ELNA Co. with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248. During the Conspiracy Period, ELNA America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers aluminum, tantalum, and film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, ELNA Co.

30.   Defendants ELNA Co. and ELNA America are together referred to herein as "ELNA."

### iii.   Matsuo

31.   Defendant Matsuo Electric Co., Ltd. ("Matsuo") is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan.   During the Conspiracy Period, Matsuo manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

/////

7

iv.   **TOSHIN KOGYO**

32.   Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan.  During the Conspiracy Period, TOSHIN KOGYO manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates, to United States purchasers.

v.   **Holy Stone**

33.   Defendant Holy Stone Enterprise Co., Ltd. ("Holy Stone Enterprise") is a Taiwanese corporation with its principal place of business at 1 Floor, No. 62, Sec. 2, Huang Shan Road, Nei Hu District, Taipei, Taiwan.  During the Conspiracy Period, Holy Stone Enterprise manufactured, sold, and distributed tantalum capacitors, either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

34.   In or about December 2009, Holy Stone Enterprise publicly announced its acquisition of Hitachi AIC's tantalum and niobium capacitors division. The acquisition was completed on or about April 1, 2010, and that division was operated under the name of Holy Stone Polytech.

35.   Defendant Milestone Global Technology, Inc. ("Milestone")—which does business as HolyStone International ("HolyStone International"), an entity which Holystone Enterprise publicly claims to be a "subsidiary company" of Holy Stone Enterprise and its "direct sales office for North America"—is a California corporation with its principal place of business located at 27475 Ynez Road #288, Temecula, California 92591.

36.   From in or about December 2009, Milestone, doing business as HolyStone International—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers tantalum capacitors
/////

manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Holy Stone Enterprise (including, without limitation, Holy Stone Polytech).

37.     Holy Stone Enterprise, Holy Stone Polytech and Milestone, doing business as HolyStone International, are together referred to herein as "Holy Stone."

### vi.   Okaya

38.     Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan.  During the Conspiracy Period, Okaya Co. manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

39.     Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly-owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana 46383.  During the Conspiracy Period, Okaya America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Okaya Co.

40.     Defendants Okaya Co. and Okaya America are together referred to herein as "Okaya."

### vii.   Taitsu

41.     Defendant Taitsu Corporation ("Taitsu Corp.") is a Japanese corporation with its principal place of business located at 2-23-20, Kizuki, Nakahara-ku, Kawasaki, Kanagawa 211-0025, Japan.   During the Conspiracy Period, Taitsu Corp. manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

42.     Defendant Taitsu America, Inc. ("Taitsu America"), a California corporation, is a wholly-owned subsidiary of Taitsu Corp. with its principal place of business located at 6160 Mission Gorge Road, Suite 100, San Diego, California 92120.

During the Conspiracy Period, Taitsu America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taitsu Corp.

43.     Defendants Taitsu Corp. and Taitsu America are together referred to herein as "Taitsu."

**viii.   Shinyei**

44.     Defendant Shinyei Kaisha ("Shinyei Kaisha") is a Japanese corporation with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan.  During the Conspiracy Period, Shinyei Kaisha manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

45.     Defendant Shinyei Technology Co., Ltd. ("Shinyei Tech") is a Japanese corporation and a corporate affiliate of Shinyei Kaisha with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan.  Until February 2011, Shinyei Tech—either directly or through its business units, subsidiaries, agents, or affiliates—manufactured, sold, and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents, or affiliates, or those of Shinyei Kaisha.

46.     Defendant Shinyei Capacitor Co., Ltd. ("Shinyei Capacitor") is a Japanese corporation and a corporate "affiliate" of Shinyei Kaisha with its principal place of business located at Shinagawa Crystal Square 11F, 1-6-41 Konan, Minato-ku, Tokyo 108-0075, Japan.  Starting in or about February 2011, Shinyei Capacitor was established by Shinyei Kaisha to take over the film capacitors business of Shinyei Tech.  After in or about February 2011, Shinyei Capacitor—either directly or through its business units, subsidiaries, agents, or affiliates—manufactured, sold, and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents, or affiliates, or those of Shinyei Kaisha (including, without limitation, Shinyei Tech).

10

47.     Defendant Shinyei Corporation of America, Inc. ("Shinyei America") is a Delaware corporation and a wholly-owned subsidiary of Shinyei Kaisha with its principal place of business located at 1120 Avenue of the Americas, 4th Floor, New York, New York 10036.  During the Conspiracy Period, Shinyei America—either directly or through its own business units, subsidiaries, agents and affiliates or those of Shinyei Kaisha—sold and distributed to United States purchasers film capacitors manufactured either directly by Shinyei Kaisha or through Shinyei's business units, subsidiaries, agents and affiliates (including, without limitation, Shinyei Capacitor and Shinyei Tech).

48.     Defendants Shinyei Kaisha, Shinyei Capacitor, and Shinyei America are together referred to herein as "Shinyei."

### ix.    Nitsuko

49.     Defendant Nitsuko Electronics Corporation ("Nitsuko") is a Japanese corporation with its principal place of business located at 2031-1, Ogawara, Suzaka-shi, Nagano-ken, 382-0071, Japan.   During the Conspiracy Period, Nitsuko manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, and affiliates to United States purchasers.

### x.    Nissei

50.     Defendant Nissei Electric Co. Ltd. ("Nissei") is a Japanese corporation with its principal place of business located at 201, Motodate, Hanamaki, Iwate, 025-0061, Japan.  During the Conspiracy Period, Nissei manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries agents, and affiliates to United States purchasers.

### xi.    Shizuki

51.     Defendant Shizuki Electric Co., Ltd. ("Shizuki") is a Japanese corporation with its principal place of business located at 10-45 Taisha-cho, *Nishinomiya*, Hyogo 662-0867, Japan.  During the Conspiracy Period, Shizuki manufactured, sold, and /////

11

distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

### xii.    Soshin

52.    Defendant Soshin Electric Co., Ltd. ("Soshin Co.") is a Japanese corporation with its principal place of business located at 3-13-16, Mita, Minato-ku, Tokyo 108-8322, Japan.  During the Conspiracy Period, Soshin manufactured, sold, or distributed film capacitors either directly or through its business units, subsidiaries, agents, and affiliates to United States purchasers.

53.    Defendant Soshin Electronics of America Inc. ("Soshin America"), a California corporation, is a wholly-owned subsidiary of Soshin Co. with its principal place of business located at 2520 Mission College Boulevard #104, Santa Clara, California 95054.  During the Conspiracy Period, Soshin America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Soshin Co.

54.    Defendants Soshin Co. and Soshin America are referred to collectively herein as "Soshin."

### C.    AGENTS AND CO-CONSPIRATORS

55.    The anticompetitive and unlawful acts alleged against the Conspirators in this Complaint were authorized, ordered, or executed by their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Conspirators' businesses or affairs.

56.    Each Conspirator acted as the principal, agent, or joint venturer of or for other Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.  Each Conspirator that is a subsidiary of a foreign parent acts as the U.S. agent for Affected Capacitors made by its parent company.  As alleged more fully below, each Conspirator headquartered outside the United States relied on its agents in the United States to carry out, enforce, and conceal the cartel in the United States.

12

57.     Various individuals, partnerships, corporations, associations, persons, and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the Conspiracy.  These co-conspirators who are not named as Defendants include, but are not limited to, Panasonic Corporation, which operated during part of the Conspiracy Period under the name Matsushita Electric Industrial Co., Ltd. ("Matsushita", and together with Panasonic Corporation, "Panasonic Corp."), Panasonic Corporation of North America ("PCNA"; Panasonic Corp. and PCNA are together referred to herein as "Panasonic"), SANYO Electric Co., Ltd., SANYO North America Corporation, NEC TOKIN Corporation ("NEC TOKIN Corp."), NEC TOKIN America, Inc. ("NEC TOKIN America"; NEC TOKIN Corp. and NEC TOKIN America are together referred to herein as "NEC TOKIN"), Nippon Chemi-Con Corporation ("NCC"), United Chemi-Con Corporation ("UCC"; NCC and UCC are together referred to as "Nippon Chemi-Con"), KEMET Corporation ("KEMET Corp."), KEMET Electronics Corporation ("KEC"; KEMET Corp. and KEC are together referred to herein as "KEMET"), Nichicon Corporation ("Nichicon Corp."), Nichicon (America) Corporation ("Nichicon America"), FPCAP Electronics (Suzhou) Co., Ltd. ("FPCAP"; Nichicon Corp., Nichicon America and FPCAP are together referred to herein as "Nichicon"), Fujitsu Ltd. ("Fujitsu"), Fujitsu Media Devices, Ltd. ("FMD"), AVX Corporation ("AVX"), Rubycon Corporation ("Rubycon Corp."), Rubycon America Inc. ("Rubycon America"; Rubycon Corp. and Rubycon America are together referred to herein as "Rubycon"), and ROHM Co., Ltd. ("ROHM Co."), ROHM Semiconductor U.S.A., LLC ("ROHM USA"; ROHM Co. and ROHM USA, are together referred to herein as "ROHM").

## IV.   **TRADE AND COMMERCE**

58.     During the Conspiracy Period, each Defendant, directly or through one or more of its parents, affiliates, subsidiaries, or business units sold or delivered to U.S. purchasers aluminum, tantalum, or film capacitors in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.  By way of

13

example, the following Defendants assisted their respective corporate parent Defendants with the sale or delivery to United States purchasers of the parents' respective aluminum, tantalum, or film capacitors: Hitachi Chemical America; ELNA America; Milestone (doing business as HolyStone International); Okaya America; Taitsu America; Shinyei America; and Soshin America.

59.    Conspirators engaged in illegal conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable anticompetitive effects on commerce throughout the United States.

60.    During the Conspiracy Period, Conspirators collectively controlled the markets for Affected Capacitors both globally and in the United States.

61.    The United States is a large and important market for Affected Capacitors.  Sales in the U.S. account for a significant portion of Conspirators' revenues. As such, the U.S. capacitors market was a major focus of the Conspiracy.

62.    Conspirators knowingly and intentionally sent price-fixed and bid-rigged Affected Capacitors into the stream of commerce of the United States.  Such conduct was meant to produce and did in fact produce a substantial harmful effect on U.S. commerce in the form of artificially high prices being paid for Affected Capacitors by U.S. customers, including Plaintiff.

63.    Affected Capacitors manufactured abroad by Conspirators and sold in the United States constitute domestic or import commerce.

64.    To the extent any Affected Capacitors were purchased by Plaintiff, and these purchases do not constitute domestic or import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

65.    The unlawful conduct described herein, and its anticompetitive effect on U.S. commerce, proximately caused antitrust injury to Plaintiff in the United

/////

14

States in the form of supracompetitive prices for Affected Capacitors, which were the natural, foreseeable, and intended consequence of Defendants' anticompetitive conduct.

## V.    FACTUAL ALLEGATIONS

### A.    Background

#### i.    What are Capacitors?

66.    Capacitors are passive electronic components that play a crucial role in electrical circuits.  Virtually every electrical circuit contains one or more capacitors.

67.    Capacitors serve as reservoirs of electric energy.  They do not require electrical power to operate; their physical properties cause them to naturally perform their function—namely to regulate the electrical current flowing through a circuit in accordance with the particular demands of the devices in which they are contained.  The amount of charge the capacitor can hold at a given voltage defines its capacitance, and capacitors ensure that the load current demands of the circuits and devices in which they are installed are met.

68.    Every capacitor consists of two or more parallel conductive metal plates, each separated from the next by a layer of non-conductive insulating material called a "dialectric."  Each plate is attached to a wire referred to as a "lead," which connects it to the rest of the circuit.



*A basic capacitor:  an insulating dialectric sandwiched between two metal plates.*

69.    When electric current flows into the capacitor via the leads, one plate acquires a positive charge, and the other, a negative charge, creating an electric field between the two plates.  The opposite charges attract but can never reach each other because of the dialectric that separates them, allowing the capacitor to hold its charge.

70.    There are three main categories of capacitors: electrostatic, electrolytic, and electrochemical.  The Conspiracy affected the markets for electrolytic

capacitors, specifically aluminum and tantalum capacitors (named for their conductive materials) and electrostatic capacitors, specifically film capacitors (named for their insulating materials).

### ii. Electrolytic Capacitors:  Aluminum and Tantalum

71.    Electrolytic capacitors are polarized, meaning that they have to be positioned in a particular direction within an electrical circuit (with the positive lead facing the positive side of the power source, and the negative lead facing the negative side).  Their polarized nature gives them a higher capacitance than their electrostatic counterparts, allowing for more sophisticated applications.

72.    Aluminum and tantalum capacitors, named for the metals of which they are comprised, are two of the most popular forms of electrolytic capacitors. Aluminum and tantalum capacitors were subjects of the Conspiracy.

### iii. Electrostatic Capacitors:  Film

73.    Electrostatic capacitors are not polarized and therefore can be installed in either direction.  They have a lower capacitance than their electrolytic counterparts, but allow for stable and sustained usage at a low cost.

74.    Film capacitors, which are a type of electrostatic capacitors, employ a layer of plastic film as their insulating dialectric.  Film capacitors were a subject of the Conspiracy.

## VI.    MARKET CHARACTERISTICS AND TRENDS THAT FACILITATED AND MOTIVATED THE CONSPIRACY

75.    A number of characteristics made the capacitors industry particularly prone to successful price-fixing and bid-rigging during the Conspiracy Period. Conspirators were aware of each of the factors described below and exploited them to achieve their injurious anti-competitive ends throughout the Conspiracy Period.

### A.    Complete Commoditization

76.    In spite of their crucial functions, capacitors are commoditized products. Most are small and simple, typically costing no more than a few cents, and

sometimes as little as a fraction of a cent.  Across the global market, capacitors of the same form, dialectric, and capacitance produced by different manufacturers can be freely substituted for one another, rendering one brand essentially indistinguishable from any other.  Indeed, manufacturers of products incorporating capacitors often utilize several different brands of the same type of capacitor interchangeably within a single device.

77.     As Conspirators recognized prior to and throughout the Conspiracy Period, the interchangeability of different brands of capacitors rendered the market especially susceptible to anticompetitive manipulation.  Pricing is the primary differential between competitors and, accordingly, the principal basis upon which purchasing decisions on Affected Capacitors are made.  Therefore, curtailing price competition, as Conspirators did here, effectively eliminated competition.

78.     Moreover, as a result of the interchangeability of their product offerings, Conspirators were able to more readily agree on uniform prices and more easily detect any Conspirator's failure to adhere to those prices.

**B.     Market Concentration**

79.     Together, Conspirators accounted for the majority of Affected Capacitors sales both globally and in the United States throughout the duration of the Conspiracy period.  In 2014, the final year of the Conspiracy, Conspirators collectively accounted for over 70% of Affected Capacitors sales.

80.     Given their collective domination of the Affected Capacitors market, Conspirators were able to control the overall pricing and supply of Affected Capacitors throughout the Conspiracy Period.  Non-participants did not have strong enough market power to undercut the cartel's concerted pricing and meet all or a significant part of the demand for Affected Capacitors.

**C.     Barriers to Entry**

81.     High barriers to entry in the capacitors market also allowed Conspirators to maintain their dominance despite charging supracompetitive prices.

/////

82.     The commoditized nature and low profit margins of capacitors create a landscape in which profitability depends on achieving large economies of scale.  The capacitors industry is a mature one dominated by established corporations, each having multinational operations, global market reach, and diverse product portfolios of various types of passive electrical components.  Conspirators have significant experience in the global capacitors industry and established reputations with both sellers of raw materials and purchasers of finished capacitors.  They have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes.  This readily available access to capital also permits manufacturers like Conspirators to establish and secure necessary supply chain commitments for all raw materials they require.  Many Conspirators have developed internal processing capabilities for raw materials or have established relationships with raw materials producers to ensure that their requirements will be met.

83.     Before it can compete with established players like Conspirators, a new entrant in the capacitors market must invest hundreds of millions of dollars to build fabrication plants, acquire the necessary production technology, hire and retain skilled and knowledgeable manpower, secure the raw materials and supply chain commitments necessary to manufacture competitive products, and market its products to potential purchasers.

84.     No notable new manufacturers have entered the aluminum, tantalum, or film capacitors industries in well over a decade, other than through strategic alliances or acquisition of companies or business units already producing specific electrolytic capacitor products (*e.g.*, Hitachi AIC's sale of its tantalum capacitor production operations to Holy Stone in 2009).

D.     **Weak Demand**

85.     Conspirators were motivated by the need to stabilize prices and maintain their investment in Affected Capacitors in the face of declining demand.

18

86.     According to a leading capacitors industry analyst, global consumption of aluminum, tantalum, and film capacitors has been declining for over a decade.  Consumption of tantalum capacitors dropped from approximately 2.4% of global volume for fiscal year 2003 to an estimated 1.1% for 2014.  Consumption of aluminum capacitors dropped from approximately 10.2 % for fiscal year 2003 to an estimated 6.8% for fiscal year 2014.  Consumption of film capacitors dropped from approximately 2.5% for fiscal year 2003 to an estimated 1.1% for fiscal year 2014.

87.     Though Affected Capacitors are used in a wide array of devices, demand for Affected Capacitors over the past decade or so has been largely tied to the demand for consumer electronics.  For instance, one of the Conspirators' 2013 annual report states that the company's 21.7% decrease in capacitor sales "is attributed to declining demand for digital home electronics and inverter equipment."

88.     In particular, personal computers have historically accounted for a significant portion of global capacitor consumption, but that segment has experienced decreasing sales since the early 2000s.  Industry analysts have indicated that declining demand for these products has negatively impacted the demand for aluminum and tantalum capacitors.  Aluminum and tantalum capacitors manufacturers have historically derived close to 50% of their revenues from the computer market.

89.     In addition, the consumer audio-video segment, which has also historically accounted for a significant portion of global capacitor consumption, has also faced significant decreasing sales over the last decade because portable music devices, tablets, and smart phones have replaced them in meeting consumers' audio-visual needs.  The fall-off of the audio-visual market had a significant impact on the demand for aluminum and film capacitors.

90.     During the 2008 recession, shrinking automobile sales further diminished demand for Capacitors.  MK Meeting notes state, *inter alia*, "The automotive sales in the United States were less than 1 million units in September.  It was the first since February 1993.  The conditions are very gloomy[;]" "The sales for in-vehicle

19

applications in main markets are not good and there is no way out in sight[;]" "Car-related business is particularly bad and sales will decrease by about 30%. . . . Conductive product sales will decrease by 40% [from the prior month]."

91.     An October 15, 2008 Competitor Trend Report based on a recent "JFC" (Japanese Film Capacitors) group meeting notes that film capacitor orders received by each competitor "stay low because of economic slump in North America, no positive forecast is being observed for 2009."

92.     Additionally, immediately prior to and throughout the Conspiracy Period, ceramic capacitors began to compromise Affected Capacitors sales.  Ceramic capacitors are electrostatic in nature, and utilize ceramic as their dialectrics.  The low cost and malleability of ceramic makes it a superior alternative to Affected Capacitors in many applications.   Capacitance is traditionally a function of a capacitor's surface area. Because of ceramic's plasticity, many alternating layers of ceramic and metal can be tightly "stacked," increasing surface area and thus capacitance, without significantly growing the size of the capacitor.  The resulting products, introduced in the late 1990s, are known as "MLCCs" (multilayer ceramic capacitors).

93.     Throughout the Conspiracy Period, ceramic capacitors continued to rise in prominence, while growing cheaper and cheaper.  Currently, the price of MLCCs is, on average, only a fraction of the price of aluminum, tantalum, and film capacitors, with an average per unit price of approximately $.0006.  Even the cheapest Affected Capacitors can be 100 times more expensive on a per unit basis.  A 2011 industry report circulated by one of the Conspirators states, "Because all customers changed what they could to MLCC due to the impact of price increases, demand [for manganese tantalum capacitors] decreased suddenly.  The decrease was 20 to 30% compared to last year.  It will just continue to decrease from now on too[.]"

94.     As a result, during the Conspiracy Period, many original equipment manufacturers and component manufacturers invested the enormous time and expense required to redesign the electrical circuits in the products they produce to replace

20

aluminum, tantalum, or film capacitors with ceramic capacitors. For example, March 11, 2009 MK Meeting Notes state that, in contrast to the prior models, Samsung's new LCD TV model would incorporate MLCC capacitors rather than tantalum capacitors "so no more orders are expected."

95.    As a result of the above market trends, producers were left with excess supply and insufficient demand for Affected Capacitors to maintain their investment.  Faced with increased requests by purchasers for price reductions, Conspirators feared that price competition would reduce, if not eliminate, profitability for Conspirators' Affected Capacitor-manufacturing operations.

96.    Under normal business conditions, when confronted with weak demand conditions, firms will attempt to maintain their sales by taking market share from competitors through decreasing prices.  For this reason, firms faced with static or declining demand have a greater incentive to collude with competitors to avoid price competition and profit erosion.

97.    MK Meeting Notes from 2008 reflect the following common sentiment amongst Conspirators:  "In this situation, if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability.  But if the production decreases, the management demands an increase in the sales in their natural course of action."

98.    In order to stabilize prices, Conspirators engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices, limiting supply, and rigging bids for Affected Capacitors sold in the United States and elsewhere.

**E.    Inelastic Demand**

99.    Demand inelasticity for Affected Capacitors further facilitated the Conspiracy, allowing Conspirators to raise prices to supracompetitive prices without significantly undermining sales volumes.

/////

/////

21

100.    Demand inelasticity means that price variations do not significantly impact sales volumes.  This phenomenon is experienced when a product has an important function, but has few or no practical substitutes.

101.    There are three primary categories of direct purchasers for Affected Capacitors:  (1) original equipment manufacturers ("OEMs") who incorporate capacitors into their finished electronic products; (2) component manufacturers ("CMs") who manufacture and assemble circuit boards and other electric circuit products that are integrated into finished electronic products, and (3) electronic component distributors who buy capacitors for resale to OEMs and CMs.  Plaintiff falls into this third category. All of these purchasers buy Affected Capacitors in large volume, as everyday electronics may contain dozens or even hundreds of capacitors.

102.    Demand—particularly short and medium term demand—is inelastic for aluminum, tantalum, and film capacitors.  As set forth above, capacitors are a fundamental and necessary component of a vast array of electronic products.  While different brands of like capacitors are mutually interchangeable, different forms of capacitors typically are not.  Electric circuits are designed to accommodate capacitors with specific capacitances, materials, and shapes (i.e., "form factors").  Thus, even with the technological and material advancements to ceramic capacitors, a product or component manufacturer would in many instances have to redesign and re-engineer the relevant circuits of its products to accommodate a substitute—which could prove enormously expensive and time-consuming.  Although over time original equipment and component manufacturers made the investments necessary to redesign certain of their products to allow for the lower cost ceramic capacitors, that transition did not impact the short and medium-term demand for Affected Capacitors, which remained inelastic. Notably, purchasers of Affected Capacitors often faced strict deadlines tied to promised product delivery dates that deprived them of meaningful choice in the face of supracompetitive prices.

/////

103.   Further, capacitors typically account for a very small percentage of the production cost of the finished electronic devices in which they are contained. Notwithstanding their critical functions, nearly all Affected Capacitors cost well under $1 per unit, with most costing no more than a few cents, and many costing mere fractions of a cent.  Therefore, even a significant increase in the price of Affected Capacitors would have a minimal effect on the purchase price of electronic devices.

**F.     Large Number of Purchasers With Limited Purchasing Power**

104.   In the markets for aluminum, tantalum, and film capacitors, Conspirators sell to a wide number of purchasers around the globe, the vast majority of which during the Conspiracy Period made up no more than 10% of each Conspirator's respective annual net sales, year over year.

105.   Conspirators were therefore able to avoid even their most valuable clients' requests for better terms, providing lockstep prices and production lead times to purchasers who tried to shop around for the best deal.  An internal email from one of the Conspirators dated December 2007 states:  "Member companies are increasing their prices.  Although I am afraid our good clients will request reduction, we will not need to reduce our prices."

**G.     Ease of Information Sharing Among Conspirators**

106.   Because of their common trade associations and existing interrelationships, Conspirators had many opportunities both before and during the Conspiracy Period to discuss and exchange competitive information regarding the pricing and supply of Affected Capacitors.

107.   Various Conspirators have attended bi-annual meetings of the World Capacitors Trade Statistics program since its inception in 1986.  This program was formed for the purpose of collecting and disseminating monthly statistics on world shipments of capacitors.

/////

/////

23

108.    The World Capacitors Trade Statistics program includes Japanese, American, and European trade organizations that provided networking opportunities for Conspirators.

109.    Aside from these organizations' formal gatherings, during which Conspirators were able to discuss and exchange sensitive competitive information, Conspirators also have numerous business connections between their former and current colleagues, co-venturers, or partners employed by other Conspirator companies.   Key decision-makers for the major producers have both direct and indirect personal access to one another.   These relationships were also exploited to further the Conspiracy and exchange sales intelligence.

## VII.    THE CONSPIRACY

### A.    Price-Fixing, Supply Constraint, and Bid-Rigging

110.    In order to maintain the value of their investments in Affected Capacitors in the face of waning demand and deteriorating market conditions, Conspirators combined, conspired, and contracted to suppress and eliminate competition for Affected Capacitors sales by fixing prices, constraining supply, and rigging bids. This occurred for the duration of the Conspiracy Period, which ranged from at least September 1997 through approximately March 2014.

111.    Conspirators charged their customers supracompetitive prices determined by both oral and written agreements, understandings, and exchanges of sensitive competitive information provided by each Conspirator.  Conspirators' electronic communications and cartel meeting notes from throughout the Conspiracy Period include statements like:   "[C]apacitors are running short in the market and there is no better timing than now for us to raise prices." "Let's stop this meaningless competition." "That's too cheap! Put your price up!" "Let us proceed while exchanging information so that we are not taken for a ride by customers."   "Our past competition for winning market share resulted in an extremely severe situation of the industry as a whole . . . we wish to /////

24

cooperate with you so that the industry will be back to life again.  We kindly ask for your continued cooperation."

112.    Conspirators exchanged information regarding fixed and variable input costs that impacted their product pricing (*e.g.*, raw materials costs, labor costs), sales volumes, profitability, current prices, intended future prices, production capacity, market forecasts, customer, product and industry-specific pricing demands, and proposed responses thereto.   Conspirators provided one another with this secret business intelligence during formal cartel meetings, ad hoc meetings between subsets of Conspirators, and through miscellaneous written and oral communications.

113.    Conspirators monitored the prices of their fellow cartel members during the Conspiracy Period and punished those who strayed from the agreed pricing, typically through temporary exclusion from cartel meetings and other informational exchanges.

114.    Additionally, at times during the Conspiracy Period, "cheaters" were reprimanded during cartel meetings for pursuing their individual interests over those of the cartel by failing to adhere to the Conspirators' price-fixing agreements.

115.    In order to justify and maintain their inflated prices, Conspirators further agreed to reduce production in order to prevent excess supply from further diminishing prices.

116.    Notes from an October 8, 2008 MK Meeting, remarked that Conspirators, including Defendants Matsuo, ELNA, and Hitachi commonly agreed:  "if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability.  But if the production decreases, the management demands an increase in the sales in their natural course of action."

117.    Conspirators coordinated to quote similar or identical production lead times (elapsed time between placement of the order and delivery of the goods) to purchasers in order to manipulate the balance of supply and demand in Conspirators'
/////

favor.  This coordination permitted Conspirators to mete out the supply of their products, thereby artificially restricting supply and creating the perception of a supply shortage.

118.    Conspirators regularly attempted to justify their increased production lead times to their customers through contrived excuses like difficulties obtaining raw materials necessary for production (*e.g.*, tantalum ore and powder, aluminum foil, plastic film, dielectric resins), labor shortages, and production and shipping delays caused by natural disasters (*e.g.*, the 2011 Tohoku earthquake and tsunami, typhoons in Asia, and flooding in Thailand and other countries where Conspirators' capacitor manufacturing facilities are located).  Although some of these events may have temporarily had some genuine effect on production, the nature and extent of that impact was exaggerated by Conspirators to account for their artificially constrained supplies of Affected Capacitors and increased prices.

119.    Additionally Conspirators engaged in bid-rigging so that each could "mutually secure a market share" without having to meaningfully lower its target prices. Competitors for common customers coordinated their respective bids for business in order to allocate market shares consistent with their production capacities, agreeing in advance which seller should "win" the bid and what their respective initial and final offers should be to guarantee the desired outcome.

120.    As a result of Conspirators' bid-rigging, customers were prevented from negotiating competitive prices for the products they purchased and were forced to pay Conspirator's collusive overcharges.

**B.    Conspiratorial Meetings**

121.    At least by 1997 and continuing throughout the Conspiracy Period, certain Conspirators attended regular and ad hoc meetings in which sensitive competitive information regarding Capacitors was exchanged and minimum prices were set.

122.    Each of these meetings constituted overt acts in furtherance of the Conspiracy.

/////

26

123.   These meetings were an outgrowth of regular industry gatherings dating back to the 1980s in which the participants exchanged historical summary pricing and sales data.

124.   Based on the information disseminated and agreements reached at these different cartel meetings, the Conspirator attendees agreed to price Affected Capacitors collusively, stand united against price reduction demands, and set production and delivery dates to collusively control supply in the Affected Capacitors markets.

125.   Meeting rosters and notes indicate that Defendants ELNA, Hitachi, Holy Stone, Matsuo, Nissei, Nitsuko, Okaya, Shinyei, Shizuki, Soshin, Taitsu, and TOSHIN KOGYO participated in, were informed of, and/or were discussed at, the cartel's regular meetings.

126.   The participants at these cartel meetings generally represented their corporate families on the whole and did not make known to the other participants any divisions in interest between the various affiliated entities on whose behalf they appeared.

127.   All participants understood that the other participants in cartel activities entered into agreements and understandings with one another on behalf of all entities within their respective corporate enterprises.

128.   As such, participants in meetings, communications, and other activities undertaken to effectuate the Conspiracy were agents of, and made commitments for, their full corporate families.

129.   This is reflected in records of meetings throughout the Conspiracy Period, which do not distinguish between entities or officers within a single corporate enterprise or corporate family.  Instead, membership rosters, reports, and minutes from cartel meetings identify corporate enterprises, usually by the abbreviated name of the ultimate corporate parent (*e.g.*, "ELNA," "Hitachi," etc.).

130.   Certain cartel meeting participants held multiple positions with both their parent companies and the parent's subsidiaries, underscoring the fact that their

conspiratorial actions were simultaneously undertaken for the benefit of various corporate affiliates.  For example:

(a)     Zenichiro Uehara—General Manager for Soshin Co.'s Sales Department who served as both President and a Managing Director of Soshin America—attended JFC meetings.

(b)     Takehisa Okumura—General Manager and Sales Supervisor of Shinyei Tech, who served as both President and Chairman of the Board of Shinyei America—also attended JFC meetings.

131.   Conspirators, including Defendants Hitachi, ELNA, and Matsuo each played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the Conspiracy Period.   Each of these Conspirators manufactured both electrolytic capacitors (*i.e.*, aluminum and/or tantalum) and film capacitors and had global presence in the Affected Capacitors markets.   Hitachi and Matsuo regularly attended cartel meetings where attendees fixed prices for both electrolytic and film capacitors.   This overlap of membership between the electrolytic and film capacitors groups allowed the Conspirators involved in the cartel to integrate and coordinate their collusive efforts.

132.   The participant rosters would occasionally change when cartel members agreed to exclude from the meetings, at least for a time, certain Conspirators that were suspected of cheating on the cartel through using the competitively sensitive information they received through the cartel's operation for their own individual benefit.

133.   Cartel meetings took various forms and were known by various names throughout the Conspiracy Period.

134.   Between 1999 and 2003, various Conspirators attended periodic regional group meetings, including the KCC Meetings (regarding sales in the Kangai region of Japan), and Hananoki meetings (regarding sales in the Hananoki region of Japan).   During these meetings, sales and production statistics and sensitive market information were shared.

135.   "ECC" (Electrolytic Capacitor Company) Meetings also occurred regularly throughout this period.   There were two types of ECC Meetings:   monthly meetings that were attended by managerial-level employees and biannual meetings attended by upper-level executives.   Various Conspirators regularly attended these ECC Meetings.

136.   ECC Meetings included discussions about individual and collective pricing of aluminum capacitors.   Members would complain if other members were pricing their products too low.

137.   The Foreign Trade Committee of the ECC discussed overseas business, including pricing for those markets.   Attendees of the Committee meetings agreed to restrain trade on a global basis, including with respect to U.S. sales.

138.   "TC" (Tantalum Capacitors) Meetings were held from at least 2001-2003.   These meetings also involved pricing discussions and the exchange of sensitive competitive information.

139.   An organizational chart reflects the Chair Companies and Audit Companies for the TC Meetings from 2001 through 2007.   Included on the chart were Defendants Hitachi, ELNA, and Matsuo.   A 2002 TC Meeting Trade Committee Roster reflects the same members.

140.   In 2003, the ECC and TC Meetings were combined, resulting in regular "ATC" (Aluminum Tantalum Capacitors) meetings, at which Defendants Hitachi, ELNA, and Matsuo were regular participants.

141.   In 2005, the ATC Meetings were renamed the "MK" (Marketing) or Market Study Group Meetings.   These ATC/MK Meetings were held periodically through at least 2010.

142.   Monthly ATC/MK Meetings were attended by manager-level employees of various Conspirators—including Defendants ELNA, Matsuo, and Hitachi. These meetings focused on the exchange of competitively sensitive data, such as production and sales volumes, current and future excess capacity, current and future

pricing, raw material pricing and access issues, as well as various other statistics. Representatives of each Conspirator in attendance would make a presentation regarding his company's sales situation.

143.   Biannual ATC/MK meetings were attended by the Conspirators' high-level executives. During these meetings, each company's executive would give a formal presentation regarding the current market landscape for their products, complete with current and historical sales performance and profitability data for both Japanese and overseas markets (including the U.S.), current customer requests, industry trends, and future pricing and production intentions for aluminum and tantalum capacitors. During these meetings, participants would frequently recommend inflated prices to be implemented by the other cartel members.

144.   During these meetings, Conspirators also discussed and agreed on the uniform denial of customers' price reduction requests, and how such denials should be handled and justified, as well as the uniform prices to be charged.

145.   An "Overseas Trade Sectional Meeting" of the "ATC Group" was formed at least as early as 2003. The attendees at these meetings discussed sales of aluminum and tantalum capacitors in non-Japanese markets (*i.e.*, including the United States), and prices were mutually agreed upon among the participants. Representatives from Defendants ELNA, Matsuo, and Hitachi participated in the "Overseas Trade Sectional Meeting" discussions.

146.   Meeting minutes from the August 31, 2003 joint session of the Overseas Trade Sectional Meeting of the ATC Group provided the following mission statement:  "The purpose of the meeting is to exchange information by market and by capacitor category so that each company will be able to enjoy profits and that healthy market prices will be maintained."

147.   These same minutes reflect specific discussions of U.S. sales, noting the stagnation of ELNA's U.S. business, but also noting that "GM is enjoying brisk sales (Business circumstances vary among Big 3)."

148.    From at least 2007 to at least 2009, various Conspirators also attended "JFC" (Japanese Film Capacitors) meetings every few months.

149.    During these meetings, individual pricing and profits data regarding film capacitors was shared and participants agreed on concerted price increases.

150.    A 2008 JFC Membership List reflects that the following Defendants were members:  Okaya, Shinyei, Soshin, Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, and Hitachi.

151.    Specific examples of collusive activity that occurred at the regular cartel meetings include:

(a)    May 13-14, 1999 ECC Meeting:  Executives from at least Defendants Hitachi, ELNA, and Nitsuko attended.  Conspirator attendees shared detailed information regarding their productions, sales, and profits for Affected Capacitors.

(b)    Various Conspirators, including Defendants Nitsuko, Nichicon, Taitsu, TOSHIN KOGYO, Shizuki, Hitachi, Soshin, and Shinyei, attended cartel meetings held during the 3rd Quarter of 2002.  At the meetings, Conspirator attendees discussed, among other things, demand for film capacitors in the United States, and exchanged competitively sensitive, non-public information concerning volumes of sales and shipments for products that used film capacitors.

(c)    Various Conspirators, including Defendants Nitsuko, Soshin, Shizuki, TOSHIN KOGYO, Okaya, and Hitachi, attended cartel meetings held during the 4th Quarter of 2002.  At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' recent and historical pricing for tantalum capacitors and their strategies regarding price increases.

(d)    Various Conspirators, including Defendants Nitsuko, Soshin, TOSHIN KOGYO, Shizuki, Taitsu, Nissei, and Hitachi, attended cartel meetings held during the 1st Quarter of 2003.  At these meetings, Conspirator attendees discussed, among other things, business conditions in the United States, and competitively sensitive, non-public information concerning demand for film and electrolytic capacitors.

31

(e)     Various Conspirators, including Defendants Nitsuko, Soshin, Taitsu, Nissei, TOSHIN KOGYO, Nippon Chemi-Con, Shizuki, and Hitachi, attended cartel meetings held during the 2nd Quarter of 2003.   At these meetings, Conspirator attendees discussed, among other things, the volumes of film capacitors they had shipped and the prices per unit, and anticipated increases in Affected Capacitor prices.

(f)     Various   Conspirators,   including   Defendants   Hitachi,   Nichicon, Rubycon, ELNA, and Matsuo, attended cartel meetings held during the 3rd Quarter of 2003.   At these meetings, Conspirator attendees discussed, among other things, their common goals to maintain high prices for Affected Capacitors and prices of Affected Capacitors for U.S. automotive manufacturers.

(g)     Various Conspirators, including Defendants Hitachi, Nissei, Soshin, Taitsu, Nitsuko, TOSHIN KOGYO, and Shinyei, attended cartel meetings held during the 2nd Quarter of 2004.   At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' anticipated price increases to export customers.

(h)     Various Conspirators, including Defendants Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, and Hitachi, attended cartel meetings held during the 4th Quarter of 2004.   At these meetings, Conspirator attendees discussed, among other things, overseas conditions for the market for film capacitors.

(i)     Various Conspirators, including Defendants Hitachi, ELNA, Matsuo, Taitsu, Nissei, Nitsuko, Soshin, TOSHIN KOGYO, and Shinyei, attended cartel meetings held during the 2nd Quarter of 2005.   At these meetings, Conspirator attendees discussed, among other things, certain Conspirators' refusal to lower prices in response to a request from large customers.

(j)     Various Conspirators, including Defendants Nissei, Nitsuko, Soshin, ELNA, Taitsu, TOSHIN KOGYO, Shinyei, Hitachi, Nichicon, and Matsuo, attended cartel meetings held during the 3rd Quarter of 2005.   At these meetings, /////

32

Conspirator attendees discussed, among other things, coordinating pricing for Affected Capacitors in the 3rd and 4th Quarters of 2005.

(k)     Various Conspirators, including Defendants ELNA and Matsuo, attended cartel meetings held during the 4th Quarter of 2005.  At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(l)     Various Conspirators, including Defendants Hitachi, TOSHIN KOGYO, Okaya, Taitsu, Shinyei, Nitsuko, Nissei, and Soshin, attended cartel meetings held during the 1st Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, market conditions, pricing intentions, plans with respect to entering or not entering specific market sectors, and information shared at trade association meetings.

(m)     Various Conspirators, including Defendants Hitachi, ELNA, and Matsuo, attended cartel meetings held during the 2nd Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(n)     Various Conspirators, including Defendants ELNA, Hitachi, and Matsuo, attended cartel meetings held during the 3rd Quarter of 2006.   At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Capacitors sales.

(o)     Various Conspirators, including Defendants Okaya, Taitsu, Nissei, Hitachi, Soshin, ELNA, and Matsuo attended cartel meetings held during the 4th Quarter of 2006.   At these meetings, Conspirator attendees discussed, among other things, domestic and global capacitor market share and conditions.

/////

(p)     Various Conspirators, including Defendants ELNA, Matsuo, Okaya, Soshin, Taitsu, Nissei, Nitsuko, Hitachi, Shinyei, and TOSHIN KOGYO, attended cartel meetings held during the 2nd Quarter of 2007.   At these meetings, Conspirator attendees discussed, among other things, market conditions for film capacitors by appliance.

(q)     Various Conspirators, including Defendants Matsuo, Nissei, Nitsuko, Hitachi, Soshin, TOSHIN KOGYO, and Shinyei, attended cartel meetings held during the 3rd Quarter of 2007.   At these meetings, Conspirator attendees discussed, among other things, the cartel's agreement to increase prices.

(r)     Various Conspirators, including Defendants ELNA, Taitsu, Nitsuko, Okaya, Hitachi, Soshin, TOSHIN KOGYO, Shinyei, and Nissei, attended cartel meetings held during the 4th Quarter of 2007.   At these meetings, Conspirator attendees discussed, among other things, their plans to increase film capacitor prices, despite customer requests for price reductions.   The Conspirator attendees also discussed specific pricing intentions regarding specific customers.

(s)     Various Conspirators, including Defendants TOSHIN KOGYO, Hitachi, Soshin, Nitsuko, Nissei, Okaya, Taitsu, and Shinyei, attended cartel meetings held during the 2nd Quarter of 2008.   At these meetings, Conspirator attendees discussed, among other things, customer pricing, including implementing price hikes and non-Japan market conditions.   Specifically, certain of the Conspirator attendees agreed to stabilize prices and resist customer efforts to request price reductions.

(t)     Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK meeting on July 10, 2008.   Conspirator attendees discussed their companies' Affected Capacitors production and sales statistics and current and future pricing information, as well as market and product trends affecting production costs and demand.   The participants agreed to collective price increases for ECAP manganese tantalum capacitors.   A report from that meeting states:   "A request for cooperation has been made in relation to price of, and the mark-up (differences between

34

the domestic and international prices) of halogen-compatible ECAP/OS-CON [aluminum capacitors]."

(u)     Various Conspirators, including Defendants Nissei, Okaya, Taitsu, Shinyei, Hitachi, and Toshin, attended a JFC Meeting on September 16, 2008.  At the meeting, Conspirator attendees discussed sales and production trends and data and status reports regarding price hike negotiations with customers of film capacitors.  A report of that meeting entitled "Movements of Other Companies" details the sensitive competitive information exchanged at this meeting and states, in part, "[w]e decided to accept the film price hike effective on April 1."

(v)     Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK Meeting on October 8, 2008.  Conspirator attendees presented their respective Affected Capacitors sales data and agreed that the market conditions were poor and sales would significantly decrease in the remainder of the year.  Firms agreed that struggling to improve their businesses would only cause further decreases in prices and profitability, but that constraining supply of Affected Capacitors would allow them to demand higher prices.  Downward sales forecasts for North America were specifically discussed.

(w)     Various Conspirators, including Defendants Nissei, Taitsu, Shinyei, Okaya, Soshin, Matsuo, ELNA, and Hitachi, attended cartel meetings during the 4th Quarter of 2008.  At these meetings, Conspirator attendees discussed, among other things, implementing film capacitor price increases, current production status, market conditions in foreign markets, including North America, and ending price competition on film capacitors.

(x)     Various Conspirators, including Defendants Okaya, Toshin Kogyo, Nissei, Nitsuko, Shinyei, Shoshin, and Taitsu, attended a JFC Meeting on February 13, 2009.  At this meeting, Conspirator attendees exchanged sensitive sales and profits data and discussed future pricing intentions.

/////

(y)     Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended a MK Meeting in April 2009.  Conspirator attendees discussed product and industry specific demand levels.  In particular, participants discussed current demand levels for Affected Capacitors in the United States, including as a function of the performance of major U.S. automobile manufacturers ("Car-related demand may fall in and after May if things do not go well for the Big Three of the United States").

(z)     Management executives of various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended a MK Meeting in May 2009.  Conspirator attendees discussed their companies' respective production and demand levels and diminishing MLCC prices.  Participants noted that business in the U.S., "where demand arises principally for industrial machinery, equipment, and cars," was "in a slump."

(aa)     Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK Meeting in June 2009.  Conspirator attendees discussed widespread under-supply of aluminum capacitors as a result of their concerted supply constraint.

(bb)     Various Conspirators, including Defendants Matsuo, Hitachi, and ELNA, attended an MK Meeting in July 2009.  Conspirator attendees discussed individual current and anticipated sales volumes and pricing structures and corrections.

(cc)     Various Conspirators, including Defendants Hitachi and ELNA, attended an MK Meeting in August 2009.  Conspirator attendees discussed collectively maintaining E-CAP production at 70% of each company's capacity, which had effectively reversed the supply-demand imbalance, allowing Conspirators to continue to "choose or reject each order" as "all manufacturers have order backlogs" and the "demand-supply situation [was]  tight."  Participants chastised a Conspirator for cheating on applicable price-fixing agreements.

(dd)     Various Conspirators, including Defendants ELNA, Matsuo, and Hitachi, attended an MK Meeting in September 2009.   Conspirator attendees

36

discussed "price recovery activities" for combatting the strong yen and high crude oil prices.   As usual, participants also exchanged sensitive competitive information pertaining to their respective pricing, demand, and profitability.  A report of the meeting noted that it would push "price recovery negotiations" for "US$ basis customers."

(ee)    Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK Meeting in October 2009.  Conspirator attendees discussed their current pricing, profitability, and sales trends in particular industries and markets, including the United States.  A Conspirator noted that it had "[a]lready raised prices by 150% [on manganese tantalum capacitors], and it came to a profitable level price-wise." ELNA reported that its ECAP aluminum capacitors sales "[f]or U.S. automotives" were "in a situation of being transported by air through Fedex every week."

(ff)    Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK meeting in November 2009.  A report of the meeting states, "[a]lthough all companies are in a good atmosphere in terms of order reception, profit hasn't been made due to the effects of exchange rates.  Price increase has been on the topic.  There is intention for increasing prices of aluminum polymer (rolled-up type) but no such talk on tantalum polymer."  A participant in the meeting reported that it was "conducting negotiations for price increase mainly with overseas customers." Participants exchanged sensitive competitive information regarding current and future pricing for various aluminum and tantalum capacitor models.

(gg)    Various Conspirators, including Defendants Matsuo, ELNA, and Hitachi, attended an MK Meeting in January 2010.  The Conspirator attendees exchanged sensitive information regarding pricing and profitability and reported high orders across the board.  Conspirator attendees noted the continuing "tight supply-and-demand" for manganese tantalum capacitors, but noted declining demand for other Capacitors as a result of MLCCs.  Hitachi reported on the upcoming acquisition of its tantalum and niobium business by Holy Stone.

/////

37

(hh)   Various Conspirators, including Defendants Matsuo, ELNA, Holy Stone, Okaya, Taitsu, TOSHIN KOGYO, Shinyei, and Nissei, attended cartel meetings held in the 2nd Quarter of 2010.   At these meetings, Conspirator attendees discussed, among other things, their current sales data, current pricing information, industry and specific customer demands and trends, capacity, future Affected Capacitors production intentions, and costs of raw materials.

(ii)   Various Conspirators, including Defendants ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 3rd Quarter of 2010.   At these meetings, Conspirator attendees discussed, among other things, drastic price increases in prices of Affected Capacitors.

(jj)   Various Conspirators, including Defendants ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 4th Quarter of 2010.   At these meetings, Conspirator attendees discussed, among other things, large increases in the prices of film capacitors, and refusing to do business with customers who did not accept the increase.

(kk)   Various Conspirators, including Defendants ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 1st Quarter of 2011.   At these meetings, Conspirator attendees discussed, among other things, industry trends, information shared at JEITA meetings, and coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(ll)   Various Conspirators, including Defendants ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 2nd Quarter of 2011.   At these meetings, Conspirator attendees discussed, among other things, implementing price increases.

(mm) Various Conspirators, including Defendants Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 3rd Quarter of 2011. At these meetings, Conspirator attendees discussed, among other things, order flow for

film and aluminum capacitors, and price increases imposed for film capacitors used in televisions.

(nn)   Various Conspirators, including Defendants Okaya, Taitsu, TOSHIN KOGYO, Shinyei, Nissei, and Nitsuko, attended cartel meetings held in the 4th Quarter of 2011.   At these meetings, Conspirator attendees discussed, among other things, profits obtained due to higher prices imposed over the last year, and vowed to each other to not cut prices despite competition from Taiwanese and Korean capacitor manufacturers.

(oo)   Various Conspirators, including Defendants Okaya, Hitachi, Nissei, Taitsu, TOSHIN KOGYO, Shinyei, and Soshin attended cartel meetings held in the 1st Quarter of 2012.   At these meetings, Conspirator attendees discussed proposed increases in prices of film capacitors, and demand for products that utilize film and aluminum capacitors.

152.   Throughout the Conspiracy Period, smaller meetings were held on an ad hoc basis among subsets of Conspirators with common customers.  These meetings often occurred when a customer was asking for a price reduction.  The company with the largest share for that customer would invite its competitors to determine a satisfactory price.

153.   Both during and after these periodic cartel meetings and ad hoc bilateral or multilateral meetings, the participants communicated regarding how to avoid competing among themselves through concerted pricing, bid-rigging, and supply constraint, as well as how to convey their concerted manufacturing, delivery, and pricing changes to customers and the market.

154.   The full universe of information regarding all of the cartel meetings held in furtherance of the Conspiracy, including the dates of the meetings, the identities of the participants, the topics discussed, and the agreements reached (and by whom) is in the exclusive possession of the Conspirators.

/////

C. **Defendants' U.S.-Based Subsidiaries Marketed, Sold, and Delivered Their Parents' Price-Fixed Capacitors in Furtherance of the Conspiracy's Purpose**

155.   When Conspirators reached agreements to fix, raise, maintain or stabilize prices, or constrain supply of Affected Capacitors—whether as a result of formal or informal cartel meetings, ad hoc bilateral or multilateral meetings, or through other communications—they intended for their collusive agreements to impact the pricing and supply for all Affected Capacitors, including those sold in the United Sates.

156.   Each Defendant sold its capacitors around the world, including to direct purchasers in the United States, like Plaintiff.

157.   The Japan-based Defendants having U.S. subsidiaries (ELNA, Hitachi, Okaya, Shinyei, Soshin, Taitsu, Holy Stone) established and acquired those subsidiaries not only to market, sell, and distribute their capacitors in the United States, but also to effectuate and achieve the Conspiracy's aims and purposes.

158.   These U.S. subsidiaries and affiliates are controlled by officers and managers in Japan and their prices are controlled by their Japan-based Defendant corporate parents.

159.   These U.S. subsidiaries had no authority to independently set competitive prices.  Instead, they were bound by their foreign parents' conspiratorial price-fixing agreements (although it may be true that, from time to time, U.S.-based personnel had authority to charge higher prices that those set by the cartel).

160.   Because their Japan-based Defendant parents had significant control over all aspects of their business (*e.g.*, Affected Capacitors' supply, pricing, business strategy, customer relations, sales, and personnel decisions), many of the U.S. subsidiaries operated as little more than sales offices in the U.S. for their respective Japan-based Defendant parents.  Indeed, as set forth below, many of the Japan-based Defendant parents named their own employees directors, officers or managers of their U.S. subsidiaries, and many of these employees held the U.S. executive positions without

40

ever leaving Japan. As a result, these U.S. subsidiaries were, as intended, able to advance the cartel aims in the United States.

      **D.**     **Soshin America Advanced the Conspiracy's Aims and Purposes in the United States for Soshin Co.**

161. Soshin America—Soshin Co.'s wholly-owned U.S. subsidiary identified on Soshin Co.'s website as one of its "Overseas Operations"—sells Soshin Co.'s film capacitors to customers in the United States.

162. The vast majority of Soshin Co.'s capacitors sold into the United States are sold through Soshin America, with a limited amount sold through distributors or other authorized resellers.

163. Soshin America does not manufacture any of Soshin's film capacitors sold in the United States; they are all manufactured overseas. Accordingly, Soshin America is dependent on Soshin Co. for the supply of capacitors it markets, sells, or delivers in the United States.

164. Soshin's capacitor sales in the United States are directed and supervised by Soshin Co.'s sales department personnel resident in Japan. Accordingly, all sales planning, strategy, and pricing decisions relating to Soshin capacitors sold in the United States are made by Soshin Co. sales and management personnel in Japan, and Soshin America employees have no discretion or authority to conduct business without authorization from Soshin Co.'s Japan-based sales department.

165. From at least 1999 to 2014, nearly all of Soshin America's directors and officers concurrently held sales or management positions at Soshin Co.

166. Soshin Co. personnel holding positions at Soshin America or doing business with the company's U.S. customers were knowledgeable about the existence of the Conspirators' cartel, as well as the cartel's aims and purpose.

167. Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Soshin. During these discussions, Soshin's representatives and their fellow cartel members reported on available demand and pricing

activity for various global regions, including information specific to the North American capacitor market. Soshin Co. used Soshin America to collect the information exchanged at these meetings.

168.    Information about Conspirators' price-fixing agreements were disseminated to the Soshin personnel holding positions at Soshin America or doing business with the company's U.S. customers by those who participated in cartel meetings.

169.    The Soshin personnel that participated in cartel meetings and activities held positions of authority within Soshin Co.'s sales and planning departments.

170.    Soshin Co.'s complete control over Soshin America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**E.    Shinyei America Advanced the Conspiracy's Aims and Purposes in the United States for Shinyei Kaisha**

171.    Shinyei America—Shinyei Kaisha's U.S.-based wholly-owned subsidiary—sells Shinyei branded film capacitors to customers in the United States.

172.    Shinyei America does not manufacture any of Shinyei's film capacitors sold in the United States; they are all manufactured overseas by Shinyei Kaisha and other affiliates of Shinyei America, including Shinyei Capacitor and formerly Shinyei Tech. Accordingly, Shinyei America is dependent on Shinyei Kaisha to provide it with the capacitors it markets, sells, or delivers in the United States.

173.    The vast majority of Shinyei's capacitors sold into the United States are sold through Shinyei America.

174.    Shinyei's capacitors sales in the United States are directed and supervised by Shinyei sales department personnel resident in Japan. Accordingly, all sales planning, strategy, and pricing decisions relating to Shinyei's capacitors sold in the United States are made by Shinyei sales and management personnel in Japan, and Shinyei

/////

America employees have little to no discretion or authority to conduct business without authorization from Shinyei's Japan-based sales department.

175.   Shinyei Kaisha has regularly assigned key sales and management personnel from subsidiaries such as Shinyei Tech/Shinyei Capacitor to positions at Shinyei America.  Personnel assigned to Shinyei America positions regularly perform those duties concurrently with their Shinyei Tech/Shinyei Capacitors duties.  Some such personnel perform their Shinyei America duties from Shinyei offices in Japan and therefore are not physically present in the United States.

176.   Shinyei Tech/Shinyei Capacitor personnel holding positions at Shinyei America or doing business with the company's U.S. customers were knowledgeable about the existence of Conspirators' cartel, as well as the cartel's aims and purpose.

177.   Demand for Capacitors in the United States was regularly discussed among cartel members, including Shinyei. During these discussions, Shinyei's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various regions, including information specific to the North American capacitor market.   Shinyei used Shinyei America to collect the information exchanged at these meetings.

178.   Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to the Shinyei personnel holding positions at Shinyei America who supervised and oversaw Shinyei America sales staff or did business with the company's U.S. customers.

179.   The Shinyei personnel that participated in cartel meetings and activities held positions of authority within Shinyei Tech/Shinyei Capacitor.

180.   Shinyei's control of Shinyei America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

/////

F.      **Okaya America Advanced the Conspiracy's Aims and Purposes in the United States for Okaya Co.**

181.    Okaya America—Okaya Co.'s U.S.-based wholly-owned subsidiary—sells Okaya branded film capacitors to customers in the United States.

182.    Okaya America does not manufacture any of Okaya's film capacitors sold in the United States; they are all manufactured overseas by other Okaya entities.  Accordingly, Okaya America is dependent on Okaya Co. to provide it with the capacitors it markets, sells, or delivers in the United States.

183.    All of Okaya's capacitors sold in the United States are sold through Okaya America.

184.    Okaya's capacitors sales in the United States are directed and supervised by Okaya Co.'s sales department personnel resident in Japan.  For example, materials outlining Okaya's company-wide internal process controls indicate that any price quotations must be approved by the Okaya Co.'s Overseas Sales Group Leader. Accordingly, all sales planning, strategy, and pricing decisions relating to Okaya's capacitors sold in the United States are made or supervised by Okaya sales and management personnel in Japan and Okaya America employees have little to no discretion or authority to conduct business without authorization from Okaya's Japan-based sales department.

185.    Okaya Co.'s oversight of Okaya America's sales efforts and product pricing is in line with its overall close management of the U.S.-based subsidiary as one of its domestic sales offices.

186.    Okaya Co. has regularly assigned sales and management personnel to positions at Okaya America.  Personnel assigned to Okaya America positions regularly perform those duties concurrently with their Okaya Co. duties.  Some such personnel perform their Okaya America duties from Okaya offices in Japan and therefore are not physically present in the United States.   Others work in the United States for a period of time, but eventually return to Japan to continue working for Okaya Co.

44

187.    Okaya Co. personnel holding positions at Okaya America or doing business with the company's U.S. customers were knowledgeable about the existence of Conspirators' cartel, as well as the cartel's aims and purpose.

188.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Okaya.   During cartel meetings, Okaya's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors various global regions, including information specific to the North American capacitor market.   Okaya used Okaya America to collect the information exchanged at these meetings.

189.    Information regarding the cartel's agreements concerning pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Okaya personnel holding positions at Okaya America who supervised and oversaw Okaya America sales staff or did business with the company's U.S. customers.

190.    Okaya Co.'s control of Okaya America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

G.    **Taitsu America Advanced the Conspiracy's Aims and Purposes in the United States for Taitsu Corp.**

191.    Taitsu America also lacks corporate separateness from its parent, Taitsu Corp.

192.    Taitsu America does not manufacture any of Taitsu's film capacitors sold in the United States; they are all manufactured overseas by Taitsu Corp. or Taitsu Corp.'s other business units and subsidiaries.   Accordingly, Taitsu America is dependent on Taitsu Corp. to provide it with the capacitors it markets, sells, or delivers in the United States.

193.    Virtually all of Taitsu's capacitors sold in the United States are sold through Taitsu America.

/////

45

194.   Taitsu's capacitors sales in the United States are directed and supervised by Taitsu's sales department personnel resident in Japan.  Accordingly, all sales planning, strategy and pricing decisions relating to Taitsu's capacitors sold in the United States are made or supervised by Taitsu's sales and management personnel in Japan.

195.   Taitsu America does not have its own domain name.  It appears on its parent's website only in its capacity as Taitsu Corp.'s American "Sales Office," accompanied only by contact information for the "office" and no further corporate details (http://www.taitsu.co.jp/english/hub/USA/index.html).   The "History of Company" section of Taitsu Corp.'s website states that in 1997 (the year of the Conspiracy's inception) it "[e]stablished distributor Taitsu America, Inc. in U.S.A."

196.   Taitsu Corp.'s website illustrates Taitsu America as an integral part of "Taitsu's Global Supply Network," which spans North America and Asia (http://www.taitsu.co.jp/english/hub/).   Taitsu Corp.'s company profile stresses that Taitsu Corp. has "been proactive in overseas expansion of our business in anticipation of globalization.  We now have bases in Japan and other parts of the world including the United States" (http://www.taitsu.co.jp/english/company/).

197.   Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Taitsu.   During cartel meetings, Taitsu's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors various global regions, including information specific to the North American capacitor market.   Taitsu used Taitsu America to collect the information exchanged at these meetings.

198.   Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Taitsu personnel holding positions at Taitsu America who supervised and oversaw Taitsu America sales staff or did business with the company's U.S. customers.
/////

46

199.    Taistsu Corp.'s control of Taitsu America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**H.    ELNA America Advanced the Conspiracy's Aims and Purposes in the United States for ELNA**

200.    ELNA America also lacks corporate separateness from ELNA Co.

201.    ELNA America does not manufacture any of ELNA's Affected Capacitors sold in the United States; they are all manufactured overseas by ELNA Co. or ELNA Co.'s other business units and subsidiaries.  Accordingly, ELNA America is dependent on ELNA Co. to provide it with the capacitors it markets, sells or delivers in the United States.

202.    Virtually all of ELNA's capacitors sold in the United States are sold through ELNA America.

203.    ELNA's capacitors sales in the United States are directed and supervised by ELNA's sales department personnel resident in Japan.  Accordingly, all sales planning, strategy and pricing decisions relating to ELNA's capacitors sold in the United States are made or supervised by ELNA's sales and management personnel in Japan.

204.    ELNA America's "About Us" page asserts that it (a) has been a "wholly-owned subsidiary of ELNA Co. Ltd." for over 35 years; (b) is "responsible for sales, service, and support to customers in North and South America;" and (c) has customers in "all market segments of the electronics industry."  The "Locations" webpage depicts a global network of ELNA Co.'s worldwide offices.  The "Products" and "News" webpages directly link to the "Capacitors" and "News release" webpages of ELNA Co.'s website, respectively.

205.    ELNA Co.'s website (www.elna.co.jp/en/) likewise shows a lack of corporate separateness from ELNA America.  ELNA Co.'s "Corporate profile & History" webpage states that ELNA Co. established "ELNA AMERICA INC., as the sales company in the USA" in March 1977 (http://www.elna.co.jp/en/company/data.html).

The "News release" webpage has posted consolidated balance sheets for ELNA Co. and its consolidated subsidiaries (including wholly-owned ELNA America) dating back to 2005.

206.    Unlike ELNA Co.'s website, ELNA America's website does not list an independent board of directors.

207.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including ELNA.   During cartel meetings, ELNA's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market.   ELNA used ELNA America to collect the information exchanged at these meetings.

208.    Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to ELNA personnel holding positions at ELNA America who supervised and oversaw ELNA America sales staff or did business with the company's U.S. customers.

209.    ELNA Co.'s control of ELNA America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

I.    **Hitachi Chemical America Advanced the Conspiracy's Aims and Purposes in the United States for Hitachi Chemical**

210.    Hitachi Chemical America also lacks corporate separateness from Hitachi Chemical.

211.    Hitachi Chemical America did not manufacture any of Hitachi's Affected Capacitors sold in the United States; they were all manufactured overseas by Hitachi Chemical or Hitachi Chemical's other business units and subsidiaries (including Hitachi AIC).   Accordingly, Hitachi Chemical America is dependent on Hitachi Chemical to provide it with the capacitors it markets, sells, or delivers in the United States.

/////

212.   Virtually all of Hitachi's capacitors sold in the United States were sold through Hitachi Chemical America.

213.   Hitachi's capacitors sales in the United States were directed and supervised by Hitachi's sales department personnel residing in Japan.  Accordingly, all sales planning, strategy, and pricing decisions relating to Hitachi's capacitors sold in the United States were made or supervised by Hitachi's sales and management personnel in Japan.

214.   Hitachi Chemical's website (www.hitachi-chem.co.jp/english/) lists Hitachi Chemical America on its "Hitachi Chemical Group [Overseas]" webpage.

215.   Hitachi Chemical America is the "[r]egional head quarter for Hitachi Chemical group companies in the U.S.A." and is responsible for "[s]ales & marketing of functional materials and advanced components and systems" and "R[esearch] & D[evelopment] in biotechnology (http://www.hitachi-chem.co.jp/english/company/group.html#usa)."  Per Hitachi Chemical's website, the "Hitachi Chemical Group Identity" is a "globally shared structure of our philosophy and values."

216.   Hitachi Chemical posted consolidated financial reports for itself and its consolidated subsidiaries (including Hitachi Chemical America) in its 2014 Annual Report.

217.   Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Hitachi.  During cartel meetings, Hitachi's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors various global regions, including information specific to the North American capacitor market.  Hitachi used Hitachi Chemical America to collect the information exchanged at these meetings.

218.   Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Hitachi personnel holding positions at Hitachi Chemical America who

supervised and oversaw Hitachi Chemical America sales staff or did business with the company's U.S. customers.

219.    Hitachi Chemical's control of Hitachi Chemical America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

## VIII.   ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY

220.    Defendants' concerted and collusive actions as alleged herein artificially inflated the prices of Affected Capacitors in the U.S. and abroad.

221.    In spite of oversupply, waning demand, and a severe global recession, throughout the Conspiracy Period, Affected Capacitors prices decreased less than they would have under ordinary free market conditions, stabilized, and in some instances, even increased.

222.    As a result, Plaintiff and other purchasers collectively paid overcharges totaling hundreds of millions of dollars or more for trillions of capacitors purchased throughout the Conspiracy Period.

223.    In 2005, aluminum capacitors began to stop their price decline from approximately $55.06 per thousand in 2003.  In 2005, industry data shows that the price per unit for aluminum electrolytic capacitors was $46.76 per thousand units, and the per-unit prices hovered between approximately $40.00 and $46.00 per thousand until 2013.

224.    In 2005, film capacitors demonstrated a price increase of nearly $1.63 per thousand units from 2004, and the per unit price continued to rise on most types of film capacitors until at least the beginning of 2009, after which the price of film capacitors declined at times, though this decline was less severe than it would have been in an unfettered market due to the Conspirators' cartel.

225.    Economic analysis of the impact of the cartel is in its earliest stage, and much of the relevant information is in the possession and control of Conspirators and not Plaintiff, so the full nature and extent of the Conspiracy's anti-competitive effects are unknown to Plaintiff at this time.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IX.   CURRENT   U.S.   AND   INTERNATIONAL   ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY**

226.   Defendants' conspiracy to artificially raise, maintain, or stabilize prices for aluminum, tantalum, and film capacitors and to restrict the output of Affected Capacitors, was first discovered in or around 2014 by law enforcement and regulatory authorities in the United States and throughout Asia.

227.   In April 2014, the DOJ Antitrust Division confirmed to industry sources that the government had opened an investigation into price fixing in the Affected Capacitors industry.

228.   The San Francisco office of the DOJ's Antitrust Division is leading the DOJ's ongoing investigation into the Affected Capacitors industry.

229.   Conspirator Panasonic became the first Conspirator to approach U.S. and Chinese authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

230.   As a required part of applying for leniency through the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Panasonic admitted to price-fixing in the Affected Capacitors market.  ACPERA provides criminal and civil leniency benefits for the first price fixing conspiracy participant who voluntarily comes forward and admits its anticompetitive conduct to the DOJ.

231.   In connection with its ACPERA application, Panasonic proffered facts and documents regarding the scope of its conspiratorial conduct.  Plaintiff draws support for many of the allegations pled herein from that information.

232.   On September 2, 2015, the DOJ announced the first criminal charges in connection with the Conspiracy—against NEC TOKIN.  The DOJ's Information against NEC TOKIN dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014," and charged that the Conspiracy sought "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in

51

the United States and elsewhere." The Information further alleged that NEC TOKIN "knowingly joined and participated in the charged conspiracy from at least as early as April 2002 until in or about December 2013." At a hearing held before the Honorable James Donato of the United States District Court for the Northern District of California on January 21, 2016, NEC TOKIN pleaded guilty "to the violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, that is charged in the Information."

233. On April 7, 2016, the DOJ announced that Hitachi Chemical agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. Like the DOJ's information against NEC TOKIN, the DOJ's information against Hitachi also dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." The Information charged Hitachi Chemical with conspiring with its competitors between 2002 and 2010. On June 9, 2016 Hitachi Chemical pled guilty to conspiring with its competitors to fix the prices of electrolytic capacitors as charged in the Information.

234. The DOJ has reportedly been coordinating its efforts to investigate the capacitors industry with the People's Republic of China's National Development and Reform Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council.

235. On or about July 2, 2014, the NDRC publicly confirmed its investigation into the capacitors industry through a report published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau. In this report, Xu revealed that one Japanese capacitor company self-reported its cartel activity in March 2014, and that this company along with other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products. Media and industry sources have quoted Xu as saying that the Japanese manufacturer seeking amnesty would receive complete leniency.

236.   On March 29, 2016, the Japan Fair Trade Commission ("JFTC") issued Cease and Desist Orders and Surcharge Payment Orders against a number of Conspirators, including Defendants Hitachi and Matsuo, for their participation in the Conspiracy.   The orders were the product of an on-going investigation that the JFTC began in or about June 2014 after Panasonic self-reported its involvement in the Conspiracy.  According to media reports citing sources close to the JFTC's investigation, sales executives and other officials from the Conspirators discussed and agreed upon price increases for Affected Capacitors for at least several years during the Conspiracy Period.

237.   Since the beginning of 2014, investigations into the capacitors industry also have been opened by the South Korean Fair Trade Commission, the Taiwanese Fair Trade Commission, the European Commission's competition authority, and Brazil's Council for Economic Defense (CADE).

238.   On December 9, 2015, the South Korean Fair Trade Commission determined that a number of Conspirators, including Defendants Elna and Matsuo, violated the Korean Fair Trade Act by exchanging sensitive business information and reaching agreements to restrain competition in Affected Capacitors.

239.   In November 2015, the European Union's antitrust regulator filed charges against ten Asian manufacturing companies that it suspects may have participated in a cartel to influence the sale of Affected Capacitors.

240.   In December 2015, Taiwan's Fair Trade Commission imposed a record fine of approximately $176.6 million on ten international capacitor suppliers for price collusion and joint monopolization; Taiwan's Fair Trade Commission Vice Chairman, Chiu Yung-ho, stated that the ruling was reached as a result of a joint investigation with the European Union, Singapore, and the United States.

241.   Sources suggest that certain of the Conspirators have been subject to raids orchestrated by authorities from around the world.   To date, a few of the Conspirators have publicly commented about their being subject to these raids.

242. During March 2014, the NDRC conducted several raids on Chinese operations of Japanese capacitors manufacturers. Following Chinese action, there have been reported raids in the European Union, Japan, and Korea.

243. Conspirator Panasonic confirmed that it was raided by both the JFTC and South Korean authorities.

244. Defendant NEC TOKIN confirmed that it was contacted or raided by American, Chinese, and European authorities and has stated that it is cooperating with authorities.

245. Defendant TOSHIN KOGYO confirmed that it was contacted by Japanese, Chinese, and Taiwanese authorities.

## X.    FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND THE CONTINUING TORT DOCTRINE

246. During the Conspiracy Period, Plaintiff had neither actual nor constructive knowledge of the pertinent facts upon which its claims are predicated, despite diligence in trying to discover such facts. Plaintiff could not have discovered through the exercise of reasonable diligence the existence of the Conspiracy alleged herein until in or about March 2014, when investigations by the DOJ and competition and law enforcement authorities in the People's Republic of China, Japan, Taiwan, South Korea and the European Union were first made public.

247. Conspirators knew their activities were illegal and therefore agreed to keep the Conspiracy, their meetings regarding the Conspiracy, and all documents evidencing the Conspiracy highly confidential, even within their own companies.

248. Conspirators did not take or distribute official minutes or reports concerning the secret cartel meetings discussed above because they recognized sensitive competitive information was exchanged amongst them during these meetings. Any disclosure of the matters, information, and data discussed in the many cartel meetings attended by Conspirators throughout the Conspiracy Period could expose the Conspiracy,
/////

54

thereby frustrating its purpose and exposing Conspirators to criminal and civil liability throughout the globe, including in the United States.

249.   A 2006 email reflects Conspirators' efforts to keep their collusive actions secret:  "[E]xchanging information is useful. . . . However, it may become a double-edged sword at times.  To the extent possible, try to exchange verbally so that no evidence is left behind.  Especially pricing figures and important presentation materials."

250.   The secret cartel meetings are evidenced by emails, summaries, and notes drafted by the employees of Conspirators who attended the meetings. These documents, which evince Conspirators' collusive discussions and unlawful agreements, were circulated only among a limited number of employees who were responsible at their respective companies for implementing the cartel's anticompetitive agreements.  These emails, summaries, and notes regularly included instructions from their authors to guard the documents with the utmost caution due to the sensitive competitive information contained therein.

251.   For example, October 2008 MK meeting notes included the following warning:  "Since [t]he gathering should not be disclosed to the public, please be careful when handling the contents of the present report."

252.   An October 15, 2005 email regarding a customer's frustrations with undersupply and excess lead times warned that "information leakage regarding this matter would cause grave problems that would lead directly to a suspension of transaction.  We urgently request you to take the utmost care in this matter."

253.   Similar conspiratorial correspondences read, "[p]lease do not distribute this email unless it is absolutely necessary[,]" "[p]lease take the utmost care in handling this report[,]" and, "[o]nce you read this email, please delete it."

254.   Conspirators also guarded the identities of Conspirators and their relevant employees by using code to refer to such participants in written communications, *e.g.*, "Company E," "Company H," "Company M," "Company N," "Company NC," "Company R."

255.   Conspirators further concealed the Conspiracy from Affected Capacitors consumers by providing pre-textual justifications for the pricing changes and the reductions in output and increased production lead times that occurred during the Conspiracy Period, citing materials shortages, labor shortages, and weather events.

256.   For example, in 2010, Conspirators each made a number of public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of aluminum foil and increasing costs for other raw materials required for manufacturing.

257.   With respect to tantalum capacitors, Conspirators cited a worldwide shortage of tantalum.  In 2010 and 2011, Conspirator Panasonic made a number of public statements to industry and technology media attributing supply limitations and pricing adjustments for its tantalum electrolytic capacitors to raw materials supply issues.

258.   These explanations are belied by industry and other media reports that criticize the lack of true visibility into the market for tantalum, highlight tantalum capacitor manufacturers' close ties and business arrangements with tantalum mining operations, and recognize manufacturers' efforts to process certain raw materials in-house.

259.   Conspirators also made numerous misleading excuses to justify their price increases, including alleged labor shortages and shipping delays due to weather events in Asia.

260.   More specifically, from 2011 to 2013, Conspirators, including Defendants Hitachi and ELNA, attributed their production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

261.   Conspirators' pre-textual, materially false, and misleading statements were designed to conceal their conspiracy and convince Plaintiff and other customers that the artificially high Affected Capacitors pricing and increased production lead times were the natural result of ordinary market forces, rather than the product of any conspiracy.

262.   As a result of the fraudulent concealment of the Conspiracy by Defendants and their co-conspirators, the running of any applicable statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive and unlawful conduct alleged herein.

263.   Also as a result of Defendants' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defenses.

264.   Further, the multi-year Conspiracy constitutes a continuing tort, and therefore, the statute of limitations cannot accrue until the last act of Conspirators' unlawful conduct.

## XI.   PLAINTIFF'S INJURIES

265.   Plaintiff suffered direct, substantial, and reasonably foreseeable injuries as a purchaser of Affected Capacitors as a result of the Conspiracy.

266.   Plaintiff purchased Affected Capacitors directly from certain of the Conspirators at prices that were artificially inflated as a result of the Conspiracy.

267.   Throughout the Conspiracy Period, Conspirators controlled the market for Affected Capacitors, forcing Plaintiff to purchase Affected Capacitors at artificially inflated prices.

268.   Accordingly, Plaintiff suffered antitrust injury in connection with its purchases of Affected Capacitors during the Conspiracy Period, in an amount equal to the total of the overcharges it paid, to be determined at trial.

## XII.   CLAIM FOR RELIEF

### Restraint of Trade in Violation of the Sherman Act § 1, 15 U.S.C. § 1 (Alleged against all Defendants)

269.   Plaintiff hereby incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint.

270.   Beginning no later than September 1, 1997 and continuing through approximately March 31, 2014 (the exact dates being unknown to Plaintiff and

exclusively within the knowledge of Conspirators), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of aluminum, tantalum, and film capacitors sold directly to U.S. purchasers.

271.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of aluminum, tantalum, and film capacitors sold to United States purchasers during the Conspiracy Period.

272.    As a result of Defendants' unlawful conduct, prices for Affected Capacitors were raised, fixed, maintained, and stabilized in the United States.

273.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Conspirators.

274.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)    Participating in meetings and conversations to discuss pricing and supply of Affected Capacitors;

(b)    Allocating customers and market shares between themselves through bid-rigging;

(c)    Communicating (both orally and verbally) to fix target prices, floor prices, and price ranges for Affected Capacitors;

(d)    Agreeing to manipulate prices and supply of Affected Capacitors sold in the U.S. in a manner that deprived direct purchasers of free and open competition;

(e)    Issuing price announcements and price quotations in accordance with the agreements reached;

(f)     Selling Affected Capacitors to customers in the U.S. at noncompetitive prices;

(g)     Exchanging competitively sensitive information, including customer information and sales data;

(h)     Setting artificial and unjustified production lead times to limit the available supply of Affected Capacitors available for sale to U.S. purchasers during the Conspiracy period.

(i)     Providing false statements to the public to explain increased prices and undersupply for Affected Capacitors;

275.   As a result of the unlawful conduct and acts undertaken in furtherance of the Conspiracy by Defendants and their co-conspirators, Plaintiff's business and property were injured, in that Plaintiff paid more for Affected Capacitors than it would have paid in the absence of Conspirators' unlawful conduct.

## XIII.   DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff demands judgment in Plaintiff's favor and against Defendants adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and that Plaintiff's business and property were injured as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it as provided by the federal antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Plaintiff shall be awarded pre-judgment and post-judgment interest on the damages it suffered, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.     Plaintiff shall recover its costs and fees incurred in this suit, including reasonable attorneys' fees as provided by applicable law; and

1    E.    Plaintiff shall receive such other or further relief as may be just and proper.

2    **<u>JURY TRIAL DEMANDED</u>**

3    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

4    of all the claims asserted in this complaint so triable.

5

6    Dated:  August 19, 2016                By: */s/        Amy Abdo*
7                                           Amy Abdo (No. 016346)
                                            Carrie Pixler Ryerson (No.
8                                           028072)
                                            **FENNEMORE CRAIG, P.C.**
9                                           2394 E. Camelback Road,
                                            Suite 600
10                                          Phoenix, AZ 85016-3429
                                            Telephone: (602) 916-5000
11                                          Email: aabdo@fclaw.com
                                            Email: cryerson@fclaw.com
12

13                                          Robert W. Turken (*pro hac vice*
14                                          application to be submitted)
                                            Scott N. Wagner (*pro hac vice*
15                                          application to be submitted)
                                            Lori P. Lustrin  (*pro hac vice*
16                                          application to be submitted)
                                            Shalia M. Sakona (*pro hac vice*
17                                          application to be submitted)
                                            **BILZIN SUMBERG BAENA**
18
                                            **PRICE & AXELROD, LLP**
19                                          1450 Brickell Avenue
                                            Suite 2300
20                                          Miami, FL 33131-3456 305/374-
                                            7580
21                                          Email: rturken@bilzin.com
22                                          Email: swagner@bilzin.com
                                            Email: llustrin@bilzin.com
23                                          Email: ssakona@bilzin.com
24

25                                          *Attorneys for Plaintiff Avnet, Inc.*

26

27

28