Djordje Petkoski (admitted *pro hac vice*)
Todd M. Stenerson (admitted *pro hac vice*)
Michael Mitchell (admitted *pro hac vice*)
**SHEARMAN AND STERLING LLP**
401 9th St. NW
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
djordje.petkoski@shearman.com
todd.stenerson@shearman.com
michael.mitchell@shearman.com

Christopher LaVigne (admitted pro hac vice)
**SHEARMAN AND STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212)-848-4000
Facsimile: (212)-848-7179
christopher.lavigne@shearman.com

John Cove (SBN 212213)
**SHEARMAN AND STERLING LLP**
535 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 616-1139
Facsimile: (415) 616-1199
john.cove@shearman.com

*Counsel for Defendants Rubycon
Corporation and Rubycon America Inc.*

[Additional Counsel Listed on Signature Pages]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION | MDL Case No 3:17-md-02801-JD |
| | **DEFENDANTS' JOINT TRIAL BRIEF** |
| This Document Relates to: | The Honorable James Donato |
| *Avnet, Inc. v Hitachi Chemical Co., Ltd., et al.,* Case No. 3:17-cv-07046-JD | Date: Nov. 10, 2022 |
| | Time: 1:30 PM |

# TABLE OF CONTENTS

DEFENDANTS' JOINT TRIAL BRIEF……………………………………………………..1

I.     EXISTENCE OF THE ALLEGED AGREEMENT…………………………………...2

II.    KNOWING PARTICIPATION IN THE ALLEGED AGREEMENT……………...…2

III.   ANTITRUST INJURY……………………………………………………………...…5

IV.    DAMAGES……………………………………………………………………………7

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                                    **Page(s)**

3

4
*Avnet, Inc. v. Hitachi Chem. Co., Ltd.*,
  No. 3:14-cv-03264 (D. Ariz. Dec. 21, 2017) ................................................................. 1, 3, 5

5
*Catlin v. Wash. Energy Co.*,
  791 F.2d 1343 (9th Cir. 1986) ....................................................................................... 5

6

7
*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ....................................................................................... 3, 4

8

9
*In re Citric Acid Litig.*,
  996 F. Supp. 951 (N.D. Cal. 1998), *aff'd* 191 F.3d 1090 (9th Cir. 1999) ...................... 3

10
*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) ....................................................................................... 2

11

12
*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
  504 U.S. 451 (1992) ...................................................................................................... 5

13

14
*Eichman v. Fotomat Corp.*,
  880 F.2d 149 (9th Cir. 1989) ......................................................................................... 1

15
*Gerlinger v. Amazon.com, Inc.*,
  526 F.3d 1253 (9th Cir. 2008) ....................................................................................... 5

16

17
*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993) ...................................................................................................... 1, 2

18

19
*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ....................................................................................... 9

20
*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ......................................................................................... 7, 8

21

22
*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ...................................................................................................... 1

23

24
*Toscano v. PGA*,
  258 F.3d 978 (9th Cir. 2001) ......................................................................................... 2

25
*United States v. Elna*,
  16-cr-365 (N.D. Cal. Oct. 12, 2017) ............................................................................. 6

26
**Statutes**

27
15 U.S.C § 1 ...................................................................................................................... 1, 2

28

1

**DEFENDANTS' JOINT TRIAL BRIEF**

2      Avnet, Inc. ("Avnet") alleges "a long-running conspiracy . . . to fix, stabilize, and maintain

3  prices for aluminum, tantalum, **and** film capacitors." Amended Compl. ¶ 1, *Avnet, Inc. v. Hitachi*

4  *Chem. Co., Ltd.*, No. 3:14-cv-03264 (D. Ariz. Dec. 21, 2017) ("Am. Compl.") (emphasis added),

5  ECF No. 1987. According to Avnet, several Japanese, Taiwanese, and American manufacturers of

6  aluminum, tantalum and film capacitors agreed among themselves to fix the prices for these

7  capacitors through a series of meetings and communications beginning "as early as November 2001"

8  and continuing "through at least January 2014." *Id.* at ¶¶ 1, 6–7. The remaining Defendants[1] deny

9  that the conspiracy alleged by Avnet existed, that they knowingly participated in the alleged

10  conspiracy, and that their conduct caused Avnet any harm.

11      Avnet claims that Defendants, along with other alleged co-conspirators who are alleged to

12  account for 80% of Avnet's damages and who are not even named as defendants, violated Section

13  1 of the Sherman Act. To prevail at trial, Avnet will need to prove (1) the existence of the agreement

14  that it has alleged among or between competitors to fix the prices of aluminum, tantalum, and film

15  capacitors; (2) that each Defendant and each alleged co-conspirator knowingly (meaning voluntarily

16  and intentionally) entered into the alleged conspiracy with the intent to further some object or

17  purpose of the alleged conspiracy; (3) that the alleged conspiracy either occurred in or affected

18  interstate or import commerce; and (4) that the alleged conspiracy caused Avnet to pay more for

19  aluminum, tantalum, and film capacitors billed or shipped to it in the United States than it otherwise

20  would have. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795–96 (1993); *Monsanto Co.*

21  *v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 161

22  (9th Cir. 1989).

23      The evidence at trial will not support Avnet's allegations. Rather, the evidence at trial will

24  show neither the existence of the conspiracy that Avnet alleges nor the damages that it has claimed.

25

26  _____

[1] Remaining Defendants are Hitachi Chemical Co., Ltd., Hitachi AIC Inc., Hitachi Chemical Co.
27  America, Ltd., ELNA Co., Ltd., ELNA America Inc., Matsuo Electric Co., Ltd., Taitsu Corporation,
Taitsu America, Inc., Nissei Electric Co., Ltd., Soshin Electric Co., Ltd., Soshin Electronics of
28  America, Inc., Nippon Chemi-Con Corporation, United Chemi-Con, Inc., Rubycon Corporation,
and Rubycon America Inc.

1  Based on that evidence, Defendants will ask the jury to return a verdict of not liable as to each

2  Defendant.

3    **I.      Existence of the Alleged Agreement**

4        At trial, Avnet will have the burden of proving the existence of an agreement between and

5  among Defendants and other alleged co-conspirators (such as KEMET and AVX) that Avnet did

6  not even name as defendants. *See* 15 U.S.C. § 1; *Toscano v. PGA*, 258 F.3d 978, 983 (9th Cir. 2001).

7  The evidence will not support that claim. No witness has testified that an agreement to fix all

8  capacitor prices in the United States ever existed or that there was an agreement to fix the prices for

9  capacitors sold to Avnet. The meeting minutes so central to Avnet's case focus on prices in Asia,

10  not the United States. References to global demand and pricing trends are general in nature and do

11  not show any intent to fix prices either globally or in the United States specifically. To the extent

12  customers within the United States might have been mentioned, such evidence could indicate, at

13  most, that prices *for certain specific customers* (none of whom were Avnet) may have been affected

14  by the meetings in Asia.[2] That falls far short of establishing the sweeping conspiracy that Avnet has

15  alleged.

16    **II.     Knowing Participation in the Alleged Agreement**

17        Avnet will also be unable to prove, as it must, that all Defendants and co-conspirators

18  knowingly participated in the alleged agreement, meaning that each "had a conscious commitment

19  to a common scheme." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir.

20  2001) (quoting *Monsanto*, 465 U.S. at 768). This requires evidence that they intended to further the

21  alleged conspiracy in some way—a burden that Avnet will not be able to shoulder. In particular, the

22  evidence will not show that KEMET and AVX—who, again, account for more than 80% of Avnet's

23

24  ────────────
[2] This evidence will also undermine Avnet's attempts to prove, as it must, that the meetings in Asia
25  occurred in or affected interstate or import commerce. "[I]t is well established by now that the
    Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some
    substantial effect in the United States." *Hartford Fire Ins. Co.*, 509 U.S. at 796. Here, the evidence
26  will show that the meetings in Asia were not intended to, and in fact did not produce, "substantial
    effect" on the prices for capacitors in the United States. *Id.* The meetings focused on the Asian
27  market, not the United States. And there is no evidence suggesting that the purported agreements
    reached during these meetings were ever incorporated into the pricing of aluminum, tantalum, and
28  film capacitors sold generally (or to Avnet specifically) in the United States.

claimed damages—participated in the alleged conspiracy with the intention of furthering some aspect of the alleged conspiracy. *See* Am. Compl. ¶ 77. There is no direct evidence that KEMET and AVX agreed to fix prices with Defendants or the other alleged co-conspirators. Indeed, the evidence will establish that KEMET and AVX knew nothing about, and did not participate in, any of the meetings that form the core of Avnet's alleged conspiracy. Notes from each meeting systematically catalogue the attendees, yet KEMET and AVX never once attended any such meeting during the alleged conspiracy period. To the extent information about KEMET or AVX was discussed at these meetings, the relevant witnesses testified that they obtained such information from proper sources (such as their distributor customers), not from KEMET or AVX themselves. All witnesses questioned about the issue also testified that KEMET and AVX never attended these meetings and did not coordinate with Defendants regarding their prices for capacitors. Such testimony is particularly persuasive because these witnesses acknowledged that they discussed and coordinated some prices with their Japanese competitors. Moreover, many Defendants had already pled guilty to participating in a price-fixing conspiracy, and in doing so implicated *other* parties (not KEMET or AVX) in their guilty pleas. There is no reason why these pleas would not name KEMET or AVX if they were in fact part of the conspiracy. *See In re Citric Acid Litig.*, 996 F. Supp. 951, 955–56 (N.D. Cal. 1998), *aff'd* 191 F.3d 1090 (9th Cir. 1999). Indeed, the evidence at trial will show that the electrolytic-capacitor-manufacturer Defendants viewed KEMET and AVX as vigorous competitors with whom no agreement was possible.

Avnet will accordingly present no direct evidence of the conspiracy it alleges. And its circumstantial evidence—evidence that KEMET and AVX's pricing patterns largely matched up with some Defendants' electrolytic capacitor prices—as a matter of law cannot establish that KEMET and AVX knowingly joined the alleged agreement with the intent to further the alleged price-fixing conspiracy. "A section 1 violation cannot . . . be inferred from parallel pricing alone, nor from an industry's follow-the-leader pricing strategy." *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) (internal citations omitted). Avnet needs additional "plus factors" showing that the parallel pricing practices were intentionally coordinated and not the result of separate and

legitimate business decisions. *See id.* But Avnet's "additional evidence" amounts to nothing more than vague suggestions that KEMET and AVX may have exchanged some general information with particular alleged conspirators (or that they discussed legitimate supply agreements or potential acquisitions). The evidence will establish, however, that none of the information provided by KEMET and AVX to those specific competitors was competitively relevant to a price-fixing conspiracy, much less to the agreement Avnet alleges here. Moreover, the evidence will show that none of the information ever made its way to the meetings in Asia and that none of the information allegedly exchanged during the meetings in Asia ever ended up in the hands of KEMET and AVX.

Furthermore, the evidence will show that KEMET and AVX did not know about the meetings in Asia. Contrary to what Avnet suggests, KEMET and AVX could not have intended to provide information to a few select competitors for the purpose of funneling that information to meetings that they *did not participate in and knew nothing about*. Nor could KEMET and AVX have intended to join or further a global price-fixing conspiracy by providing general information to one or two Japanese companies in the context of actual or potential supply agreements or similar transactions when they knew nothing about their counterparts' communications with competitors about prices and similar issues that were completely divorced from their legitimate transactions. Avnet will therefore be unable to prove that KEMET and AVX ever knowingly joined the alleged agreement with Defendants and other alleged co-conspirators, much less that they did so with the intent to further the alleged conspiracy.

Avnet likewise will be unable to prove that all the various companies it sued participated in the conspiracy alleged. So, for example, Soshin and Taitsu did not even make or sell aluminum or tantalum capacitors and did not attend the meetings among manufacturers of aluminum or tantalum capacitors. Taitsu and Soshin each manufactured only film capacitors, most of which are custom-made for specific customers and for specific applications. Soshin did not sell film capacitors in the United States. Film capacitors are not interchangeable with and cannot be substituted for or with aluminum or tantalum capacitors. And there are thousands of different types of film capacitors, most of which were custom-made products for particular customers and are therefore not susceptible to

price fixing. There will be no direct evidence of Soshin or Taitsu participating in the alleged conspiracy. And Avnet will be unable to prove the alleged conspiracy by inference because it would not be plausible and economically sensible for the jury to infer that Soshin and Taitsu conspired to fix the prices of products they did not sell. *See Eastman Kodak Co. v. Image Tech. Servs. Inc*., 504 U.S. 451, 468 (1992). Be it KEMET, AVX, Soshin, or other Defendants, Avnet will fail to prove that they and all of their many alleged conspirators knowingly participated in the alleged, overarching agreement to fix U.S. prices for three different types of capacitors.

### III.    Antitrust Injury

Avnet will also need to prove that it "has suffered an injury which bears a causal connection to the alleged antitrust violation." *Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), *as amended* (Jan. 15, 1997)). Once again, however, the evidence will not bear this requirement out. To prevail, Avnet "must show that the alleged anticompetitive activity was 'a material cause of the injury.'" *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986) (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1509 (9th Cir. 1985)). Here, Avnet's alleged injury is that it paid more for the aluminum, tantalum, and film capacitors that it purchased directly from the alleged conspirators in the United States than it otherwise would have. *See* Am. Compl. ¶¶ 333–36. But there is no evidence that Avnet overpaid for any capacitors that it purchased from Defendants or from any alleged co-conspirators, much less that it overpaid *because of* a series of meetings taking place halfway around the world.

To prove that it overpaid for capacitors purchased from Defendants and other alleged co-conspirators in the United States, Avnet will rely on the testimony of its expert, Dr. Marx. But Dr. Marx admitted during her deposition that she did not perform an Avnet-specific overcharge analysis. Marx Depo. Tr. at 48:15–50:21. She did not analyze whether Avnet was, in fact, overcharged for each and every—or frankly any—aluminum, tantalum, and film capacitor that it purchased from Defendants and the alleged co-conspirators. Instead, she purports to have calculated some sort of market-wide overcharge percentage that she merely applied to Avnet's total purchases. Her analysis

1  essentially assumes that, if prices were artificially high across the market, they must have been

2  equally high as applied to Avnet.

3        The evidence will not support the notion that prices in the United States were universally

4  and uniformly raised because of the meetings in Japan. Those meetings focused on the Asian market.

5  To the extent the United States market was mentioned, pricing discussions zeroed in on specific

6  customers—generally the U.S. subsidiaries of Japanese companies or large IT companies like Intel.

7  Nothing in the records from the meetings indicates a broad agreement to raise prices for all

8  aluminum, tantalum, and film capacitors throughout the United States. Even when certain

9  Defendants pled guilty to fixing prices for capacitors in the United States, they did so only regarding

10  "*certain* electrolytic capacitors." *See, e.g.*, Plea Agreement at 4, *United States v. Elna*, No. 16-cr-

11  365 ¶ 4 (N.D. Cal. Oct. 12, 2017), ECF No. 40 (emphasis added). Thus, the evidence will show that

12  there was no overarching conspiracy to fix the prices for aluminum, tantalum, and film capacitors

13  sold in the United States.[3]

14        The evidence will further show that, even if price increases in Asia indirectly affected prices

15  paid in the United States, Avnet was not susceptible to such price increases. As one of the two largest

16  electronic components distributors in the United States. Avnet both had and exercised significant

17  buyer power over its capacitor suppliers. Avnet frequently negotiated favorable prices for the

18  capacitors it purchased. It also had many alternative sources for capacitors that were not associated

19  with any alleged conspirators to which it could (and did) turn if negotiations with alleged

20  conspirators did not turn out favorably. Because capacitors of the same type are highly

21

22  [3] The evidence at trial will also show that even if a conspiracy existed, Hitachi Chemical withdrew from any alleged conspiracy no later than March 2010. The evidence will show that Hitachi

23  Chemical noisily announced its withdrawal from trade association meetings in August 2008 and stopped attending the meetings in Japan that form the core of Avnet's claims. The evidence will

24  further show that Hitachi Chemical completed its withdrawal by March 2010 when it sold its tantalum capacitor business to Holy Stone. As the DOJ concluded at the close of its investigation—

25  and as the prosecutor represented to this Court during Hitachi Chemical's change of plea hearing— the evidence shows that Hitachi Chemical's sale of its tantalum business in March 2010 marked the

26  end of its participation in any alleged conspiracy. Because Hitachi Chemical withdrew from any alleged conspiracy by March 2010, the jury should return a verdict reflecting that Hitachi Chemical

27  is not liable for any damages after that date. Moreover, since Hitachi Chemical did not fraudulently conceal the alleged conspiracy after its withdrawal, Avnet's claims against Hitachi Chemical are

28  time barred, and therefore the jury should return a verdict of not liable as to Hitachi Chemical.

interchangeable, Avnet had no trouble meeting its needs through these alternative sources at competitive prices. Additionally, in numerous cases—including with certain Defendants—Avnet was further shielded from any price increases by arrangements in which end purchasers directly negotiated prices with manufacturers—meaning that Avnet received a contractually ensured fee for acting as the "middle man." In this way, Avnet was immune from any radiating effects allegedly felt within the United States from price adjustments in Asia.

Because the evidence will show that at most the prices of only *some* capacitors sold in the United States may have been affected by the meetings held in Asia, Avnet will need to prove that the capacitors that it purchased were subject to an alleged overcharge. But it cannot do so. As the evidence will show, Avnet was not subjected to improper price increases. And Avnet has no data to suggest that it actually paid more for the capacitors that it purchased from Defendants and other alleged co-conspirators than it otherwise should have. Again, Avnet's expert, Dr. Marx, tellingly did not even analyze that critical issue, instead simply assuming that Avnet itself was harmed by the alleged conspiracy.[4] As a result, Avnet will not be able to carry its burden of proving an antitrust injury at trial.

## IV.    Damages

As a related but separate issue, Avnet will not be able to prove, as it must, that it has suffered a non-speculative quantum of damages. To prevail at trial, Avnet "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (quoting *Dolphin Tours*, 773 F.2d at 1509–10). But Avnet's sole source of damages calculations—Dr. Marx's testimony—is the epitome of speculation and guesswork.

Dr. Marx's market-wide overcharge analysis begins with a faulty premise: It expressly relies on the mistaken assumption that KEMET and AVX—who make up the vast majority of the

---

[4] Defendants' expert, Dr. Haider, did that analysis, however. She ran Dr. Marx's model—despite its many flaws—on Avnet's own capacitor purchases and found that it generates an overcharge percentage of "as low as a percent." This dramatically smaller overcharge percentage no doubt explains why Dr. Marx refused to calculate overcharges for Avnet using its own purchases, as she should have done.

transactions underlying Dr. Marx's model—participated in the alleged conspiracy. *See* ECF No. 162-2 ¶ 9. Dr. Marx created price indices for each capacitor type that were based "on the Cartel Participants' capacitor sales that are billed to or shipped to customers in the United States," which included sales from both KEMET and AVX. *See id.* ¶ 109. Because the evidence will show that KEMET and AVX were *not* "Cartel participants," their data should not have been included in Dr. Marx's overcharge percentage calculations. Having begun with that faulty premise, all of Dr. Marx's damages calculations are completely unreliable. *See McGlinchy*, 845 F.2d at 807. This is especially true here where KEMET and AVX alone account for some 80% of Avnet's purchases, giving that voluminous data a disproportionate influence on Dr. Marx's damages analyses.

At bottom, Dr. Marx calculated Avnet's damages by first generating a purported market-wide overcharge percentage for each type of capacitor and then simply applying those percentages to the total amount of purchases that Avnet made from each Defendant and alleged co-conspirator. Her model is based on multiple faulty assumptions. To begin with, Dr. Marx incorrectly assumes that market-wide damages reliably estimate individual damages for Avnet. As already discussed, however, there was no market-wide conspiracy that caused *all* prices for aluminum, tantalum, and film capacitors in the United States to reach artificially high levels. Only a small subset of capacitors sold by some Defendants and other alleged co-conspirators in the United States potentially could have been affected by the meetings in Asia. Thus, to properly calculate Avnet's damages, Dr. Marx would have needed to analyze the specific prices paid on each and every aluminum, tantalum, and film capacitor that Avnet purchased from the alleged conspirators during the relevant time period (information that was available to Dr. Marx). She did not do this. Instead, Dr. Marx purports to have generated a "Fisher price index" based on *all* prices charged to *all* purchasers in the United States. Her model is completely unmoored from the reality of what Avnet paid and does not provide a reliable calculation of any Avnet-specific overcharges.

The slightest scrutiny of Dr. Marx's regression analysis reveals additional flaws in her methodology and proves just how unreliable it is. First, Dr. Marx's model generates a massive overcharge percentage for ceramic capacitor sales in the United States. But Avnet does not allege

any agreement to fix prices for ceramic capacitors, nor is there any evidence of any such agreement. This false positive eviscerates Dr. Marx's model. Second, Dr. Marx's model generates annual overcharges through a regression that arbitrarily resets once a year, in January. Changing the month of that reset yields wildly different results. For example, the January reset that Dr. Marx used generates an average overcharge percentage of 20.3% for tantalum capacitors—a rate nearly *three times higher* than the rate calculated by the experts in the DPP trial.[5] But if the regression reset in June, as opposed to January, that rate would shrink to just 1.6%. The variation for other capacitors is even more striking. For aluminum capacitors, a January reset results in an average overcharge rate of 13.5%. But a March reset would yield an absurd overcharge percentage of *negative* 328.4%. There is no justifiable reason for Dr. Marx to have selected January as the month of reset, and the arbitrariness of that decision and the results it yields render her damages model irreparably unreliable and speculative. This rigged approach is the proverbial thumb on the scale.

Even if Dr. Marx's model itself were not hopelessly speculative, Avnet still would not be able to present a non-speculative estimate of its damages to the jury. Avnet can recover only for overcharges that are actually attributable to Defendants' conduct. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997). It cannot recover for any alleged overcharges attributable to legitimate competition (here, for example, competition from KEMET and AVX, who were not part of the conspiracy that actually did occur in Asia) or other factors. *See id.* Dr. Marx fails to disaggregate any overcharges allegedly attributable to Defendants' conduct and those attributable to other causes, and Avnet has no other evidence to support its damages calculations. Avnet therefore will not be able to present the jury with a non-speculative number representing the damages that it allegedly sustained *as a result of Defendants' conduct*.

In summary, the evidence at trial will demonstrate that the conspiracy alleged by Avnet never existed, that Avnet suffered no harm as a result of Defendants' alleged conduct, and that Avnet cannot provide a non-speculative measure of its damages. Given this complete failure of proof, the jury will return a verdict of not liable as to each Defendant.

---

[5] In fact, all of Dr. Marx's damages model and calculations are wildly out of step with those presented by the experts in the DPP trial.

1  DATED: October 27, 2022                    Respectfully Submitted,

2                                             By:    /s/ Djordje Petkoski

3                                             SHEARMAN & STERLING LLP
                                              Djordje Petkoski (admitted *pro hac vice*)
4                                             Todd M. Stenerson (admitted *pro hac vice*)
                                              Michael Mitchell (admitted pro hac vice)
5                                             Elizabeth Vitt (admitted pro hac vice)
                                              Jacob Coate (admitted pro hac vice)
6                                             Amelia Rasmussen (admitted pro hac vice)
                                              Benjamin Fleshman (admitted pro hac vice)
7                                             401 9th St. NW
                                              Washington, DC 20004
8                                             Telephone: (202) 508-8000
                                              Facsimile: (202) 508-8100
9                                             djordje.petkoski@shearman.com
                                              todd.stenerson@shearman.com
10                                            michael.mitchell@shearman.com
                                              elizabeth.vitt@shearman.com
11                                            jacob.coate@shearman.com
                                              memmi.rasmussen@shearman.com
12                                            ben.fleshman@shearman.com

13                                            Christopher LaVigne (admitted pro hac vice)
14                                            599 Lexington Avenue
                                              New York, NY 10022
15                                            Telephone: (212)-848-4000
                                              Facsimile: (212)-848-7179
16                                            christopher.lavigne@shearman.com

17                                            John Cove (SBN 212213)
18                                            535 Mission Street, 25th Floor
                                              San Francisco, California 94105
19                                            Telephone: (415) 616-1139
                                              Facsimile: (415) 616-1199
20                                            john.cove@shearman.com

21                                            *Counsel for Defendants Rubycon*
                                              *Corporation and Rubycon America Inc.*
22

23

24

25

26

27

28

1

2   Dated: October 27, 2022                    WILMER CUTLER PICKERING HALE
                                                AND DORR LLP
3                                               Thomas Mueller (*pro hac vice*)
                                                Jennifer Milici (*pro hac vice*)
4                                               1875 Pennsylvania Ave NW
                                                Washington, DC 20006
5                                               Thomas.Mueller@wilmerhale.com
                                                Jennifer.Milici@wilmerhale.com
6

7                                               WILMER CUTLER PICKERING HALE
                                                AND DORR LLP
8                                               Chris Johnstone
9                                               2600 El Camino Real
                                                Palo Alto, CA 94306
10                                              Chris.Johnstone@wilmerhale.com
11
                                                By:  */s/ Chris Johnstone*
12

13                                              Attorneys for Defendants
                                                ELNA CO., LTD. and ELNA AMERICA,
14                                              INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 17-MD-02801-JD
DEFENDANTS' PRETRIAL BRIEF

1    Dated: October 27, 2022                    MORRISON & FOERSTER LLP

2                                               Bonnie Lau
                                                Margaret A. Webb
3                                               Lena Gankin
                                                425 Market Street
4                                               San Francisco, CA 94105
                                                blau@mofo.com
5                                               mwebb@mofo.com
                                                lgankin@mofo.com
6
                                                David Cross (Admitted pro hac vice)
7                                               Mary Kaiser (Admitted pro hac vice)
                                                2000 Pennsylvania Avenue
8                                               Suite 6000
                                                Washington, D.C. 20006-1888
9                                               dcross@mofo.com
                                                mkaiser@mofo.com
10

11

12                                              By:  */s/ Bonnie Lau* _____

13
                                                Attorneys for Defendants
14                                              MATSUO ELECTRIC CO., LTD.

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                         12

Dated: October 27, 2022

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Joseph J. Bial (admitted *pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
jbial@paulweiss.com

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Roberto Finzi (admitted *pro hac vice*)
Farrah Berse (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
rfinzi@paulweiss.com
fberse@paulweiss.com

By:  */s/ Joseph J. Bial*

Attorneys for Defendants
NIPPON CHEMI-CON CORPORATION
and UNITED CHEMI-CON, INC.

Dated: October 27, 2022

BONA LAW PC
Jarod M. Bona
Alex Shear
Luke Hasskamp
4275 Executive Square, Suite 200
La Jolla, CA 92037
Email: jarod.bona@bonalawpc.com
alex.shear@bonalawpc.com
luke.hasskamp@bonalawpc.com

By:  */s/ Jarod M. Bona*

Attorneys for Defendants
TAITSU CORPORATION and TAITSU
AMERICA, INC.

Dated: October 27, 2022

WILSON SONSINI GOODRICH & ROSATI
Chul Pak (admitted pro hac vice)
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
cpak@wsgr.com

WILSON SONSINI GOODRICH & ROSATI
Jeffrey C. Bank (admitted pro hac vice)
1700 K Street NW, 5th Floor
Washington, DC 20006
Telephone: (212) 497-7761
Facsimile: (212) 999-5899
jbank@wsgr.com

By:  */s/ Chul Pak*_____

Attorneys for Defendants
HITACHI CHEMICAL CO., LTD.,
HITACHI AIC INC., AND HITACHI
CHEMICAL CO. AMERICA, LTD.

1  Dated: October 27, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
Bridget S. McCabe (Bar No. 272545)
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:  310. 820.8800
Facsimile:   310.820.8859
Email: bmccabe@bakerlaw.com

BAKER & HOSTETLER LLP
John R. Fornaciari (admitted *pro hac vice*)
Danyll W. Foix (admitted *pro hac vice*)
1050 Connecticut Ave. N.W., Suite 1100
Washington, D.C. 20036
Telephone:  202.861.1500
Facsimile:   202.861.1783
Email: jfornaciari@bakerlaw.com
Email: dfoix@bakerlaw.com

By:  */s/ Bridget S. McCabe*

Attorneys for Defendants
SOSHIN ELECTRIC CO., LTD. and
SOSHIN ELECTRONICS OF AMERICA
INC.

## <u>ECF ATTESTATION</u>

Pursuant to Civil L.R. 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the other signatories thereto.

Executed this 27th day of October, 2022, at Washington, D.C.

*/s/ Djordje Petkoski*
Djordje Petkoski

CASE NO. 17-MD-02801-JD
DEFENDANTS' PRETRIAL BRIEF